# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Case No. 1:21-cr-35-EGS

UNITED STATES OF AMERICA

v.

JEFFREY SABOL,

                Defendant.

Crim. Action No. 21-35-1 (EGS)

## MEMORANDUM OPINION

Defendant Jeffrey Sabol ("Mr. Sabol") has been charged in a federal indictment with eight serious misdemeanor and felony offenses arising from his participation in the events at the U.S. Capitol on January 6, 2021. *See* Superseding Indictment, ECF No. 23. After Mr. Sabol was arrested in New York on January 22, 2021, a magistrate judge on the United States District Court for the Southern District of New York held a detention hearing and ordered Mr. Sabol detained pending trial due to his "risk of flight/danger." *See* Min. Entry, 7:21-mj-866-UA-1 (S.D.N.Y. Jan. 22, 2021). Pending before the Court is Mr. Sabol's Motion for Pretrial Release, which seeks his release from custody to the Pretrial Services Agency's High Intensity Supervision Program ("HISP"). Def.'s Mot. Pretrial Release ("Def.'s Mot."), ECF No. 17. The Court held a hearing on Mr. Sabol's motion on April 8, 2021. *See* Min. Entry (Apr. 9, 2021).

Upon careful consideration of the motion and opposition, the arguments set forth at the April 8, 2021 hearing, the applicable law, and the entire record herein, Mr. Sabol's motion is **DENIED**.

## I. Background

Mr. Sabol and four co-defendants are alleged to have forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with Metropolitan Police Department ("MPD") officers while they were attempting to help the U.S. Capitol Police maintain the security of the U.S. Capitol on January 6, 2021. *See* Superseding Indictment, ECF No. 23 at 1–4.[1] The sixteen-count superseding indictment, filed March 12, 2021, charges Mr. Sabol with the following offenses: (1) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); (2) Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); (3) Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); (4) a second count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); (5) Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A);

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

2

(6) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A); (7) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A); and (8) Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). *Id.* at 2, 4, 5, 6, 7, 9.

The Court sets out below the evidence proffered by the government in support of its opposition to Mr. Sabol's motion, and in favor of his continued pretrial detention, as well as a brief overview of the procedural history of this case.[2]

## A. Mr. Sabol's Conduct on January 6, 2021

Mr. Sabol has admitted to law enforcement that he was in Washington D.C. and at the U.S. Capitol on January 6, 2021, the day a joint session of the U.S. Congress convened to certify the Electoral College vote count and the 2020 Presidential Election. *See* Gov't's Opp'n, ECF No. 20 at 3. According to the government, Mr. Sabol believed that "there was no question" that the 2020 Presidential Election was "stolen." *Id.* On January 6, 2021, Mr. Sabol equipped himself with a helmet, steel-toe boots, zip ties,

---

[2] At a detention hearing, the government may present evidence by way of a proffer. *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

a radio, and an ear piece, and he traveled to Washington D.C. to
watch then-President Trump speak at a rally and to participate
in the protest against the election results, which ended in a
riot at the U.S. Capitol. *Id.*

Mr. Sabol told law enforcement that when he reached the
U.S. Capitol, he heard flashbangs going off and "recognized that
a 'battle' was already occurring," which he believed was started
by members of the left-wing anti-fascist political movement
Antifa as the "perfect set-up." *Id.* He "had to be on the front
line" of the "battle" because he is a "warrior." *Id.* Mr. Sabol's
cell phone records place him in the area around the U.S. Capitol
as of 3:29 p.m. that day. *Id.*

At approximately 4:20 p.m., MPD officers assumed a post in
an archway at the access point of the U.S. Capitol's lower
western terrace. *Id.* at 4. Among the MPD officers at that post
were Officer A.W., Officer B.M., and Officer C.M. *Id.* Shortly
after assuming the post, all three officers were "brutally"
assaulted by rioters who were part of a mob that had gathered
outside of the U.S. Capitol. *Id.* Video footage provided by the
government displays the violent attacks that left the officers
wounded and in need of medical care. *See* Exs. 2, 3, 5A to
Gov't's Opp'n, ECF No. 20. Officer A.W. sustained a laceration
that caused him to bleed from the head and required staples to
close, and Officer B.M. sustained an abrasion to his nose and

4

right cheek and minor bruising to his left shoulder. *See* Gov't's Opp'n, ECF No. 20 at 8-9.

The government proffers evidence in support of charges against Mr. Sabol for his participation in the assault of Officer A.W. and Officer B.M. *Id.* at 4-9. At around 4:27 p.m., an unknown individual charged at Officer A.W., grabbed at his face, and knocked him to his feet. *Id.* at 4. While Officer A.W. was on the ground, Mr. Sabol climbed up the U.S. Capitol steps to where Officer A.W. was laying and yanked Officer A.W.'s baton out of his hand. *Id.* at 4-5 (citing Officer A.W.'s Body Worn Camera ("BWC") Video Footage, Exhibit 2 to Gov't's Opp'n). The government provides additional video footage that "shows that Sabol used so much force in snatching [Officer] A.W.'s baton out of his hands that when he succeeded in wrestling it away from Officer A.W., [Mr.] Sabol fell back down the steps." *Id.* at 5 (citing Storyful[3] Video Footage, Ex. 3 to Gov't's Opp'n). Meanwhile, another individual, alleged to be Mr. Sabol's co-defendant Mr. Jack Wade Whitton, began striking Officer B.M. with a crutch and then pulled him by the head and helmet over Officer A.W. and down the steps into the large crowd. *Id.* Mr.

---

[3] According to its website, Storyful is a "news and intelligence agency" owned by News Corp. that was founded as "the first social media newswire . . . to break the news faster and utilize social content to add context to reporting." *See About Storyful*, Storyful, https://storyful.com/about/ (last visited Apr. 14, 2021).

Sabol then "rushed back up the steps, put his hand on Officer
B.M.'s backside, and with his right hand, held the baton that he
stole from Officer A.W. up against Officer B.M.'s neck" before
helping drag Officer B.M. face-first down the steps and into the
mob. *Id.* at 5-6 (citing Storyful Video Footage, Ex. 3 to Gov't's
Opp'n; Officer C.M.'s BWC Video Footage, Ex. 5A to Gov't's
Opp'n). After Mr. Sabol and other rioters dragged Officer B.M.
into the crowd, co-defendant Peter Stager repeatedly struck
Officer B.M. with a flagpole. *Id.* at 8. Rioters also dragged
Officer A.W.—who was at that point without the baton that Mr.
Sabol had taken from him—down into the mob where rioters ripped
off his helmet, maced him, took his gas mask and MPD-issued cell
phone, kicked him, struck him with poles, and stomped on him.
*Id.* at 8-9.

### B. Mr. Sabol's Conduct Between January 6, 2021, and His Arrest on January 22, 2021

On January 7, 2021, Mr. Sabol returned to his home in
Colorado. *Id.* at 9. There, "paranoid that he was going to be
charged with sedition," he "fried" electronic devices in his
microwave, destroyed anything that could be "misconstrued as
antigovernment," and moved two firearms that he kept at his home
to an associate's residence. *Id.*

Between January 9 and 10, 2021, Mr. Sabol traveled from
Colorado to Boston, Massachusetts. *Id.* Mr. Sabol planned to fly

from Boston to Switzerland to avoid extradition for any crimes arising from his conduct at the U.S. Capitol on January 6, 2021. *Id.* He has admitted to law enforcement that he planned to ski while in Switzerland to make his trip "look natural." *Id*. But while at the airport in Boston, Mr. Sabol saw police officers and "thought they mentioned his backpack." *Id*. He left the airport, rented a vehicle, and began driving south. *Id.* Because Mr. Sabol thought law enforcement was tracking him, he discarded his cell phone out of a window and over a bridge while he was driving. *Id.*

On January 11, 2021, officers from the Clarkstown Police Department in New City, New York responded to a vehicle that was driving erratically. *Id.* at 10. They located the vehicle, which Mr. Sabol was driving, and discovered that he was covered in blood from severe lacerations on his thighs and arms. *Id.* at 10. Mr. Sabol has admitted to law enforcement that he had attempted to take his own life. *Id.* When the Clarkstown officers found Mr. Sabol, he made spontaneous statements, including "I am tired, I am done fighting"; "My wounds are self-inflicted"; "I was fighting tyranny in the D.C. Capitol"; and "I am wanted by the FBI." *Id.* An inventory search of Mr. Sabol's vehicle uncovered razor blades, a note with instructions and password to a computer, electronic devices, his passport and Social Security Card, an airline e-ticket, a rental car agreement, and a green

7

backpack and tan Carhartt jacket similar to the backpack and jacket depicted in video footage of the attacks on the MPD officers at the U.S. Capitol on January 6, 2021. *Id.*

On January 12, 2021, Mr. Sabol spoke with law enforcement officers while he was recovering from his self-inflicted wounds at the Westchester Medical Center. *Id.* In addition to the admissions discussed above, Mr. Sabol also admitted to law enforcement officers that he was at the U.S. Capitol on January 6, 2021, wearing a brown Carhartt jacket, a black or grey helmet, a green backpack, and black gloves. *Id.* Regarding the events that took place that day, Mr. Sabol admitted he had grabbed an MPD officer's baton, but he alleged that he was there only to save the officers who he saw "needed help." *Id.*

On January 13, 2021, Mr. Sabol spoke with law enforcement again and was asked to review video footage and still photos depicting the events at the U.S. Capitol on January 6, 2021. *Id.* at 11. Mr. Sabol admitted the following: (1) he was the person in the Storyful video wearing a grey/black helmet, black gloves, and the tan/brown Carhartt jacket and green backpack that were found in his vehicle; (2) he had run up the steps of the U.S. Capitol, jumped over a barricade, and dragged an MPD officer down the steps; and (3) he is the individual shown positioned over an MPD officer who is lying face down on the ground in the still photo that is Exhibit 4 to the government's opposition.

*Id.* Mr. Sabol maintained, however, that he was trying to assist the officer who he helped drag down the steps, and he was "patting him on the back" and saying "we got you man." *Id.* He claimed that he covered the officer to protect him from rioters who were trying to hit the officer with poles. *Id*. But he also acknowledged, with respect to the image depicted in the government's Exhibit 4, that he could not recall if he hit the officer with the baton he was holding against the back of the officer's neck because "he was in a fit of rage" and the details were "cloudy." *Id.* He also stated that during the mayhem, a "call to battle was announced" and he "answered the call because he is a patriot warrior." *Id.* Mr. Sabol further admitted that once he believed law enforcement was looking for him, he deleted numerous text messages and other communications, including a video he had taken of himself and sent to an associate on January 6, 2021, in which he said he had been pepper sprayed but "we are going back in." *Id.* Law enforcement recovered the video as well as a text message from Mr. Sabol advising the associate to delete the video. *Id.*

## C. Procedural Background

Mr. Sabol was first charged with Civil Disorder in violation of 18 U.S.C. § 231(a)(3) on January 15, 2021. *See* Criminal Complaint, ECF No. 1. He was arrested and had an initial appearance and detention hearing before a magistrate

9

judge on the United States District Court for the Southern
District of New York on January 22, 2021. *See* Min. Entry, 7:21-
mj-866-UA-1 (S.D.N.Y. Jan. 22, 2021). Following the detention
hearing, the magistrate judge ordered Mr. Sabol detained pending
trial because he was deemed a "risk of flight/danger." *Id.*

On January 29, 2021, a federal grand jury indicted Mr.
Sabol, along with two co-defendants, for Civil Disorder and
other offenses arising from their actions at the U.S. Capitol,
including Assaulting, Resisting, or Impeding Certain Officers
Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1)
and (b). Indictment, ECF No. 8. On March 12, 2021, the
superseding indictment was filed. *See* Superseding Indictment,
ECF No. 23. The sixteen-count superseding indictment names Mr.
Sabol and now four co-defendants, all of whom are alleged to
have participated in the assault of MPD officers at the U.S.
Capitol on January 6, 2021. *Id.*

After his detention hearing, Mr. Sabol was transported to
the D.C. area, and he is currently in custody at the D.C. Jail.
Mr. Sabol filed the pending motion for pretrial release on
February 23, 2021, the government filed its opposition on March
9, 2021, and Mr. Sabol did not file a reply.

## II. Legal Standard

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, provides
that a hearing shall be held to determine whether a defendant

10

should be detained pretrial upon a motion by the government if the defendant is charged with an offense falling in one of five enumerated categories. 18 U.S.C. § 3142(f)(1)(A)-(E). As relevant here, a detention hearing shall be held pursuant to Section 3142(f)(1)(A) if a defendant is charged with a "crime of violence," which is "defined broadly as an offense having as an element the attempted, threatened, or actual use of physical force against a person or property of another, or a felony offense that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *See United States v. Chrestman*, No. 21-mj-218 (ZMF), 2021 WL 765662, at *4 (D.D.C. Feb. 26, 2021) (citing 18 U.S.C. § 3156(a)(4)(A)-(B)). A detention hearing shall also be held upon a motion by the government or a judicial officer's own motion if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a witness or juror. 18 U.S.C. § 3142(f)(2)(A)-(B).

If a detention hearing is held pursuant to Section 3142(f), a judicial officer "shall" detain a defendant pending trial if the judicial officer determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id*. § 3142(e). "In common parlance, the relevant

inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Munchel*, No. 21-3010, 2021 WL 1149196, at *4 (D.C. Cir. Mar. 26, 2021) (quoting *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)). When the basis for pretrial detention is the defendant's danger to the community, the government is required to demonstrate the appropriateness of detention pursuant to subsection (e) by clear and convincing evidence. *See* 18 U.S.C. § 3142(f). When the basis for pretrial detention is the defendant's risk of flight, the government is required to demonstrate the appropriateness of detention pursuant to subsection (e) by a preponderance of the evidence. *See United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

Certain conditions and charged offenses trigger a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any person and the community. 18 U.S.C. § 3142(e)(2)-(3) (providing that a rebuttable presumption arises pursuant to subsection (e)(2) if the defendant committed a "crime of violence" while on release pending trial for another offense and not more than five years after the date of conviction or the release of the person from imprisonment for that offense, or pursuant to subsection (e)(3)

if there is probable cause to believe the defendant committed one of a subset of offenses listed in that section).[4]

In cases that do not involve the conditions and charged offenses that trigger a rebuttable presumption of detention, the Court considers the following factors to determine whether detention is required to ensure the appearance of the person and the safety of any other person and the community:

1. The nature and circumstances of the offense charged, including whether the offense is a crime of violence;
2. The weight of the evidence;
3. The history and characteristics of the person, including
   A. The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning

---

[4] The subset of offenses triggering a rebuttable presumption under subsection (e)(3) include the following: "(A) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act . . . the Controlled Substances Import and Export Act . . . , or chapter 705 of title 46; (B) an offense under section 924(c), 956(a), or 2332b of this title; (C) an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed; (D) an offense under chapter 77 of this title for which a maximum term of imprisonment of 20 years or more is prescribed; or (E) an offense involving a minor victim under section 1201, 1591, 2241, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title." 18 U.S.C. § 3142(e)(3)(A)-(E).

                              appearance at court proceedings;
                              and
                          B. Whether, at the time of the
                              current offense or arrest, the
                              person was on probation, on
                              parole, or on other release; and
                       4. The nature and seriousness of the danger to
                          any person or the community that would be
                          posed by the person's release.

18 U.S.C. § 3142(g); *see also Munchel*, 2021 WL 1149196, at *4.

If a magistrate judge orders a defendant detained, the
defendant "may file, with the court having original jurisdiction
over the offense, a motion for revocation or amendment of the
order." 18 U.S.C. § 3145(b). Although the Court of Appeals for
the District of Columbia Circuit (the "D.C. Circuit") has not
squarely decided the issue of what standard of review a district
court should apply to review of a magistrate's detention order,
*see Munchel*, 2021 WL 1149196, at *5; courts in this district
have held, in line with courts across the country, that such
detention decisions are reviewed *de novo*. *See United States v.
Hunt*, 240 F. Supp. 3d 128, 132-33 (D.D.C. 2017) (referencing
cases from the Second, Third, Fourth, Fifth, Sixth, Seventh,
Eighth, Ninth, tenth, and Eleven Circuits that support this
proposition); *see also Chrestman*, 2021 WL 765662, at *5-*6. The
Bail Reform Act also provides that a detention hearing "may be
reopened . . . at any time before trial if the judicial officer
finds that information exists that was not known to the movant
at the time of the hearing and that has a material bearing on"

14

the Section 3142(g) factors. 18 U.S.C. § 3142(f); *see also*
*United States v. Peralta*, 849 F.2d 625, 626-27 (D.C. Cir. 1988).
Accordingly, the Court will review the decision to detain Mr.
Sabol *de novo* and will consider new information presented by Mr.
Sabol that he contends has a material bearing on the Court's
evaluation of his flight risk and/or danger to the community.

## III. Analysis

### A. Mr. Sabol is Eligible for Pretrial Detention Pursuant to 18 U.S.C. § 3142(f)(1)(A)

As a threshold matter, the government correctly argues, and
Mr. Sabol does not dispute, that Mr. Sabol is eligible for
pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A). *See*
Gov't's Opp'n, ECF No. 20 at 12. Under the Bail Reform Act,
unless a defendant poses a serious risk of flight or of
attempting to obstruct justice, he is only eligible for pretrial
detention if he is charged with an offense listed in one of the
five enumerated categories of Section 3142(f)(1)—*i.e.*, "the most
serious" crimes. *See* 18 U.S.C. § 3142(f)(1)(A)-(B), (f)(2);
*United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999)
("Congress limited pretrial detention of persons who are
presumed innocent to a subset of defendants charged with crimes

15

that are 'the most serious' compared to other federal offenses."
(quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987))).

The Court finds that Mr. Sabol is charged with a crime of
violence, which is the first category of crimes that makes a
defendant eligible for detention under Section 3142(f)(1). *See
id.* § 3142(f)(1)(A). As relevant here, a "crime of violence" is
either:

> (A) an offense that has as an element of the
> offense the use, attempted use, or threatened
> use of physical force against the person or
> property of another; [or] (B) any other
> offense that is a felony and that, by its
> nature, involves a substantial risk that
> physical force against the person or property
> of another may be used in the course of
> committing the offense.

*Id.* § 3156(a)(4)(A)-(B). The Supreme Court, in interpreting the
definition of "crime of violence" under a different federal
criminal statute—18 U.S.C. § 924(e)(2)(B)(i)—has held that
"physical force" means "violent force—that is, force capable of
causing physical pain or injury to another person." *Johnson v.
United States*, 559 U.S. 133, 140 (2010).

In this Circuit, courts identify crimes of violence on a
categorical basis by reference to the elements of the charged
offenses, rather than on a case-by-case basis through a fact-
intensive analysis of the defendant's alleged conduct.
*Singleton*, 182 F.3d at 10-12. When employing the categorical
approach, whether a charged offense is a crime of violence under

16

Section 3142(f)(1)(A) is a question of law and is "ascertainable by reference to [the crime's] elements, either because these elements entail the use of violence, *see* § 3156(a)(4)(A), or the risk of violence, *see* § 3156(a)(4)(B)." *Singleton*, 182 F.3d at 12. Courts will employ a "modified categorical approach," looking at "a limited class of documents" such as the indictment, if the statute at issue is "divisible"—that is, if it defines multiple separate crimes. *Mathis v. United States*, 136 S.Ct. 2243, 2249 (2016).

Mr. Sabol is charged with, among other crimes, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). *See* Superseding Indictment, ECF No. 23 at 2. Subsection 111(a)(1) provides that anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any [designated federal officer, or person assisting a designated federal officer][5] while engaged in or on account of the performance of official duties," is exposed to a maximum term of imprisonment of one year if the violation constitutes simple assault or eight years if the violation involves physical contact with the victim or the intent to commit another felony. *See* 18 U.S.C. § 111(a)(1).[6] The

---

[5] *See* 18 U.S.C. § 1114.

[6] As relevant here, under Subsection 111(b), "the use of a deadly or dangerous weapon [is] sufficient . . . to boost the crime

D.C. Circuit has determined that "the adverb 'forcibly' in the first element of the offense modifies each of the prohibited acts specified in the second element: that is, a defendant does not violate the statute unless he *forcibly* assaults or *forcibly* resists or *forcibly* opposes, etc." *United States. V. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002) (citing *United States v. Kleinbart*, 27 F.3d 586, 592 (D.C. Cir. 1994)). Subsection 111(b) increases the maximum term of imprisonment to 20 years for anyone who "in the commission of any act described in subsection (a), uses a deadly or dangerous weapon . . . or inflicts bodily injury." *Id.* § 111(b). When a defendant is charged under the first prong of Section 111(b)—for use of a dangerous weapon— "intent to use the weapon is a necessary element" of the offense. *See Arrington*, 309 F. 3d at 45. Courts have observed that to violate Section 111(b), a defendant "must have committed one of the acts described in § 111(a), *i.e.*, 'forcibly assault[ed], resisted[ed], oppose[d], impede[d], intimidate[d], or interefere[d] with' a [federal officer] in specified circumstances;' and "in committing the act," either (a) "'use[d] a deadly or dangerous weapon'" or (2) "'inflict[ed] bodily

above the level of 'simple assault.'" *United States v. Duran*, 96 F.3d 1495, 1511 (D.C. Cir. 1996).

injury.'" *Gray v. United States*, 980 F.3d 264, 266 (2d Cir. 2020) (quoting 18 U.S.C. §§ 111(a)(1), (b)).

In consideration of the elements of these offenses, Section 3156(a)(4)'s definition of a crime of violence, and the relevant case law, the Court concurs with numerous other courts in holding that a defendant charged under 18 U.S.C. §§ 111(a)(1) and (b) is charged with a crime of violence.[7] *See Gray*, 980 F.3d at 266 ("[W]e hold that a § 111(b) offense is a categorical crime of violence."); *United States v. Kendall*, 876 F.3d 1264, 1270 (10th Cir. 2017) ("To determine if every violation of § 111(b) is a crime of violence, then, we need only determine whether both an assault that causes bodily injury and an assault with a deadly weapon involve the use, threatened use, or attempted use of violent physical force. They both do."); *United States v. Taylor*, 848 F.3d 476, 492-493 (1st Cir. 2017) ("In assessing whether the enhanced versions of § 111(b) are crimes of violence, we do not write on a clean slate. In fact, every

---

[7] In other cases brought in this district, the government has taken the position that a Capitol Riot defendant charged only under Section 111(a) is not charged with a crime of violence, but a defendant charged under 111(a) *and (b)*—the "enhanced version of the statute"—is charged with a crime of violence. *See United States v. Fitzsimmons*, No. CR 21-158-KBJ, ECF No. 14 at 2 (D.D.C.). Here, Mr. Sabol is charged under both 111(a) and (b), so the Court need not reach whether 111(a), on its own, triggers a detention hearing under the "crime of violence" category of 3142(f).

19

court we are aware of that has considered the issue has found that it is because the elements of the enhanced offense require the use, attempted use, or threatened use of force capable of causing pain or injury."); *United States v. Juvenile Female*, 566 F.3d 943, 948 (9th Cir. 2009) (holding that an assault involving a deadly or dangerous weapon under Section 111 "is, categorically, a crime of violence"). A judicial colleague in this district, Judge John D. Bates, recently reached the same conclusion. *See United States v. Klein*, No. CR 21-236, ECF No. 29 at 7-12 (D.D.C. Apr. 12, 2021).

Accordingly, because using a deadly or dangerous weapon while assaulting a federal officer (or, in this case, an MPD officer assisting a federal officer) is a crime of violence, Mr. Sabol is eligible for pretrial detention under 18 U.S.C. § 3142(f)(1)(A).[8]

### B. No Condition or Combination of Conditions Will Reasonably Assure Mr. Sabol's Appearance as Required and the Safety of Any Other Person and the Community

Having found that Mr. Sabol is eligible for pretrial detention, the Court must determine whether any "condition or

---

[8] The government also argues that Mr. Sabol is eligible for detention pursuant to 18 U.S.C. § 3142(f)(2) "because he is a flight risk and there is a serious risk that he will obstruct or attempt to obstruct justice." Gov't's Opp'n, ECF No. 20 at 12. The Court addresses Mr. Sabol's risk of flight and attempt to obstruct justice in Section III, Part B. But the Court need not address these risks as a basis for Mr. Sabol's eligibility for

combination of conditions will reasonably assure the appearance
of [Mr. Sabol] as required and the safety of any other person
and the community." 18 U.S.C. § 3142(e)(1). With respect to the
danger Mr. Sabol presents to the safety of any other person and
the community, the Court "must identify an articulable threat
posed by the defendant to an individual or the community,"
though "[t]he threat need not be of physical violence, and may
extend to 'non-physical harms such as corrupting a union.'"
*Munchel*, 2021 WL 1149196, at *7 (quoting *United States v. King*,
849 F.2d 485, 487 n.2 (11th Cir. 1988)). "The threat must also
be considered in context," and "[t]he inquiry is factbound." *Id.*
(citing *United States v. Tortora*, 922 F.2d 880, 888 (1st Cir.
1990)). Mr. Sabol and the government agree that in determining
whether Mr. Sabol is a flight risk and/or danger to the
community, the Court considers the 18 U.S.C. § 3142(g) factors
including: (1) "the nature and circumstances of the offense
charged"; (2) "the weight of the evidence"; (3) "the history and
characteristics" of the defendant; and (4) "the nature and
seriousness of the danger to any person or the community that
would be posed by the [defendant's] release." 18 U.S.C. §

---

pretrial detention, as a threshold matter, because he is
eligible for detention pursuant to 18 U.S.C. § 3142(f)(1)(A).

3142(g); *see* Def.'s Mot., ECF No. 17 at 3-4; Gov't's Opp'n, ECF
No. 20 at 12.

In considering these requisite factors, as set forth below,
the Court concludes that clear and convincing evidence supports
a finding that no condition or combination of conditions will
reasonably assure the safety of the community, and a
preponderance of the evidence supports a finding that no
condition or combination of conditions will reasonably assure
Mr. Sabol's appearance as required. Accordingly, the Court
orders that Mr. Sabol remain detained pending trial. *See* 18
U.S.C. § 3142(e)(1)

## 1. Nature and Circumstances of the Offense

The first factor the Court must consider is the nature and
circumstances of the offense charged, "including whether the
offense is a crime of violence." 18 U.S.C. § 3142(g)(1).

Mr. Sabol admits that he has been charged with forcibly
assaulting, resisting, opposing, impeding, intimidating, and
interfering with MPD Officer A.W., and he acknowledges that the
government alleges he struck Officer B.M. with a police baton.
*See* Def.'s Mot., ECF No. 17 at 4. At the April 8 hearing,
however, Mr. Sabol argued he never used the police baton as a
weapon as the government alleges. Hr'g Tr., ECF No. 53 at 6:24-
25, 7:21-22. As for the remaining counts in the indictment, Mr.
Sabol avers they "arise from this alleged conduct and Mr.

22

Sabol's general presence outside of the U.S. Capitol on January 6th." Def.'s Mot., ECF No. 17 at 4. While Mr. Sabol concedes that "this alleged conduct is serious," he argues that "it appears to have arisen in the context of a hysterical throng" and took place over a matter of mere seconds. *Id.;* Hr'g Tr., ECF No. 53 at 7:16-17. His attorney also contends that Mr. Sabol now understands that his beliefs about the legitimacy of the 2020 Presidential Election were "misguided" and "wrong," and he was "lied to about the election being stolen." Hr'g Tr., ECF No. 53 at 8:5-7. He was caught up inappropriately and made "some really bad decisions," he argues, in "the frenzy" of the events that transpired on January 6, 2021, and by "things that were said to the crowd of people by people like Roger Stone and Rudy Guiliani and the President himself." *Id.* at 8:7-15. He points out that "[t]he President of the United States of America was telling citizens something evil has happened and you all have to go fix it." *Id.* at 9:11-13.

Mr. Sabol also suggests that he may have been trying to prevent his fellow rioters from attacking the MPD officers. Def.'s Mot., ECF No. 17 at 3. Mr. Sabol alleged at the April 8 hearing that video evidence (showing events that transpired about an hour before the attacks on Officers B.M. and A.W.) shows him "waving his hands like a referee" and instructing other rioters not to hurt law enforcement officers. *See* Hr'g

Tr., ECF No. 53 at 39:14-21, 38:12-17, 40:5-10. He argues that
these acts reveal his intentions and should inform the Court's
interpretation of the later attacks on the MPD officers. *Id.* at
41:2-10. In addition, Mr. Sabol attaches to his motion character
letters from his friends and family members, which he argues
"indicate that any alleged violent conduct by Mr. Sabol would be
out of character for him." Def.'s Mot., ECF No. 17 at 4.

The government, for its part, paints a grimmer picture of
the events the nation watched unfold at the U.S. Capitol on
January 6, 2021, and Mr. Sabol's participation in those events.
The government emphasizes that during the "siege of the U.S.
Capitol, multiple law enforcement officers were assaulted by an
enormous mob, which included numerous individuals with weapons,
bulletproof vests, and pepper spray who were targeting the
officers protecting the Capitol." Gov't's Opp'n, ECF No. 20 at
12. The government asserts that Mr. Sabol "was involved in some
of the most violent assaults on law enforcement that occurred"
that day, and for his active participation in the riots and the
attacks on MPD officers, he has been charged with "multiple
counts of violating 18 U.S.C. 111(a)(1) and (b) and 18 U.S.C.
231(a)(3), which are serious felony offenses." *Id.*

The government points the Court to Chief Judge Beryl
Howell's recent decision concerning the appropriateness of
pretrial detention for another participant in the January 6

24

events at the U.S. Capitol (a "Capitol Riot defendant") for an
articulation of how the Court should evaluate the nature and
circumstances of offenses arising from the events that
transpired that day:

> Grave concerns are implicated if a defendant
> actively threatened or confronted federal
> officials or law enforcement, or otherwise
> promoted or celebrated efforts to disrupt the
> certification of the electoral vote count
> during the riot, thereby encouraging others to
> engage in such conduct. These factors measure
> the extent of a defendant's disregard for the
> institutions of government and the rule of
> law, qualities that bear on both the
> seriousness of the offense conduct and the
> ultimate inquiry of whether a defendant will
> comply with conditions of release meant to
> ensure the safety of the community.

*Id.* at 13 (quoting *Chrestman*, 2021 WL 765662, at *8). The
government argues that Mr. Sabol did not just "actively
threaten[] or confront[] federal officials or law enforcement,"
but that he assaulted MPD officers, impeded their ability to do
their job, and interfered with their ability to help a protestor
who had been trampled and injured by the crowd. *Id.* Moreover,
Mr. Sabol participated in the riots with the express intent of
protesting the results of the 2020 Presidential Election, and he
then "acted on his beliefs that the 2020 election was fraudulent
and engaged in multiple violent assaults . . . on the law
enforcement officers trying to protect Congress's certification
of the 2020 Presidential election." *Id.* at 13-14. As a result of

25

Mr. Sabol's actions, the government asserts, Officer A.W. needed
staples to his head "to close the laceration he sustained during
the cumulative assaults he endured," and he and Officer B.M.
"could have easily been seriously injured, if not killed." *Id.*
at 14. And in fact, someone was killed. The protestor who had
been trampled by the mob, who the government alleges Officers
A.W. and B.M. were trying to aid when Mr. Sabol interfered and
attacked them, later died from her injuries. *Id.*

Regarding Mr. Sabol's prior statements to law enforcement
in which he claimed he was only patting Officer B.M. on the back
and saying "we got you," the government counters by referencing
BWC video footage that purportedly shows Mr. Sabol held a baton
to the back of Officer B.M.'s neck while he had another hand on
his back "as he dragged Officer B.M., face down into the crowd,
away from the outstretched arms of Officer B.M.'s colleagues who
were trying to help Officer B.M." *Id.* at 13. The government
argues that Mr. Sabol went to the U.S. Capitol on January 6th
"ready for a fight." *Id.* He equipped himself with a helmet,
steel-toe boots, zip ties, and a radio and ear piece. *Id.* at 3.
Once he was at the U.S. Capitol, Mr. Sabol "ran to the front
lines of the 'battle' . . . [s]tole the baton from an officer
who had already been attacked and knocked to the ground by one

of Sabol's fellow rioters, . . . [and] proceeded to use that

stolen baton to assault" Officer B.M. *Id.* at 12-13.

The gravity of Mr. Sabol's offenses is undeniable, and the

Court is persuaded that the nature and circumstances of the

offenses weigh in favor of his continued pretrial detention. To

start, the gravity of the conduct that occurred at the U.S.

Capitol on January 6, 2021 cannot be understated. Judge Randolph

Moss summarized the day's events powerfully:

> [The defendant] and hundreds of others took
> over the United States Capitol; caused the
> Vice President of the United States, the
> Congress, and their staffs to flee the Senate
> and House Chambers; engaged in violent attacks
> on law enforcement officers charged with
> protecting the Capitol; and delayed the solemn
> process of certifying a presidential election.
> This was a singular and chilling event in U.S.
> history, raising legitimate concern about the
> security—not only of the Capitol building—but
> of our democracy itself.

*United States v. Cua*, No. 21-107 (RDM), 2021 WL 918255, at *3

(D.D.C. Mar. 10, 2021). Nonetheless, and despite the serious and

chilling nature of the events that took place that day, the D.C.

Circuit has made clear that detention is not appropriate in all

cases involving Capitol Riot defendants. *Munchel*, 2021 WL

1149196, at *8. The Court considers the specific offenses with

which each defendant is charged and the conduct underlying those

offenses. *Chrestman*, 2021 WL 765662, at *7. The Court must

"adequately demonstrate that it considered whether [Mr. Sabol]

pose[s] an articulable threat to the community in view of [his] conduct on January 6, and the particular circumstances of January 6." *Munchel*, 2021 WL 1149196, at *8. To aid in this consideration, Chief Judge Howell has articulated "guideposts" for assessing "the comparative culpability of a given defendant in relation to fellow rioters." *Id.* The Court finds these guideposts persuasive for the purpose of differentiating among Capitol Riot defendants: (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning, "for example, by obtaining weapons or tactical gear"; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's "words and movements during the riot"—*e.g.*, whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, attempted to injure, or threatened to injure others." *Id.* at *7-*8. These factors, "[t]aken together, as applied to a given defendant, . . . are probative of 'the nature and circumstances of the offense charged,' 18 U.S.C. § 3142(g)(1), and, in turn, of the danger

posed by the defendant," as relevant to the fourth Section 3142(g) factor. *Id*. at *9.

Four of the six *Chrestman* factors strongly support a finding that Mr. Sabol's comparative culpability in relation to his fellow rioters is high. *First*, Mr. Sabol has been charged with multiple felonies. *See* Superseding Indictment, ECF No. 23. "Felony charges are by definition more serious than misdemeanor charges; the nature of a felony offense is therefore substantially more likely to weigh in favor of pretrial detention than the nature of a misdemeanor offense." *Chrestman*, 2021 WL 765662. Moreover, Section 3142(g)(1) specifically directs the Court to consider whether a defendant has been charged with a crime of violence, and at least one of the charged felonies—using a deadly weapon while assaulting an MPD officer who was assisting federal officials protect the U.S. Capitol—is a crime of violence. *See supra* Section III, Part A.

*Second*, Mr. Sabol engaged in prior planning that suggests his assaultive conduct and civil disorder did not merely arise "in the context of a hysterical throng," as Mr. Sabol claims. *See* Def.'s Mot., ECF No. 17 at 4. When Mr. Sabol went to the U.S. Capitol, he believed the 2020 Presidential Election had been stolen from former-President Trump and that the election results confirming that President Biden had won were fraudulent. *See* Gov't's Opp'n, ECF No. 20 at 14. He brought tactical gear,

29

including a helmet, steel-toe boots, zip ties, a radio and an ear piece. *Id.* at 3. He later admitted to law enforcement that he had equipped himself with this gear because he anticipated encountering counter-protesters. *See id.* at 3. He also maintained, even days after the riot when he believed he was wanted by the FBI, that he had been "fighting tyranny in the D.C. Capitol." *Id.* at 10.[9] As was true of a similarly-situated fellow rioter in *Chrestman*, this amount of prior planning and intentionality "suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with

---

[9] At the April 8 hearing, Mr. Sabol's counsel emphasized that the helmet and steel-toe boots that Mr. Sabol brought to the U.S. Capitol are irrelevant to the dangerousness analysis because Mr. Sabol did not intend to fight with the government or stop democracy, he only wore that gear because he thought counter-protesters would be present at the rallies. *See* Hr'g Tr., ECF No. 53 at 11:12-20. But whether Mr. Sabol arrived prepared to engage in violence against the government or against counter-protesters is a distinction that is of little significance when evaluating the danger he poses to the community. The Court is also not persuaded by Mr. Sabol's argument that his zip ties and two-way radio should not be considered as part of the Court's analysis of the *Chrestman* prior-planning factor because the zip ties were only "little wire cable ties that he carries with him everywhere he goes"—not like the type of zip ties used to restrain people—and the two-way radio was not intended to be used in a coordinated way with fellow rioter, and it did not work in any event. *See* Hr'g Tr., ECF No. 53 at 11:21-13:5. Regardless of the opponent, and despite his claims that certain tactical gear had alternative uses, Mr. Sabol's own admissions reveal that he planned and prepared for a fight against perceived tyranny and then did in fact engage in violence against law enforcement officers protecting the U.S. Capitol on January 6, 2021, and the Court is not persuaded that the tactical gear was not brought for that purpose.

the intention of causing mayhem and disrupting the democratic process, mandated under the U.S. Constitution, of counting and certifying Electoral College votes." *Chrestman*, 2021 WL 765662, at *8 (citing U.S. Const. art. II, § 1, cl. 3). This prior planning also differentiates Mr. Sabol from fellow rioters who are not being detained pretrial, like Mr. Frederico Klein who Judge Bates recently released. *See Klein*, No. CR 21-236, ECF No. 29 at 13-14 (considering that Mr. Klein did not carry any items that evinced an expectation that the need to engage in violence might arise, and a witness testified that she was unaware of Mr. Klein having any plans for violence while attending the "Stop the Steal" rally outside the White House). The Court is ultimately unpersuaded by Mr. Sabol's argument that he did not plan to commit violence or disrupt the electoral process on January 6, 2021, but rather was caught up in the "frenzy" that was created in part by then-President Trump's, and his associates', words and actions. *See* Hr'g Tr. ECF No. 53 at 8:5-15.

To be sure, to what extent President Trump's words and actions led to the violent and shocking storming of the U.S. Capitol on January 6, 2021 is an important question, and one that could still have legal consequences for the former President and his prominent supporters. *See Thompson v. Trump*, No. 21-cv-400-APM (D.D.C.) (civil lawsuit against President

Trump, Rudy Giuliani, Proud Boys International LLC, and Oath Keepers alleging violations of the Ku Klux Klan Act for "plot[ing], coordinat[ing], and execut[ing] a common plan to prevent Congress from discharging its official duties in certifying the results of the presidential election"). But President Trump's culpability is not before this Court. To the extent Mr. Sabol raises this issue to suggest he has a complete defense to the criminal charges he faces based on President Trump ostensibly or actually giving the rioters permission to use violence to interfere with the peaceful transition of power, that argument fails for the reasons clearly and thoughtfully articulated by Chief Judge Howell in *Chrestman.* 2021 WL 765662, at *10-*14. Indeed, "even if former President Trump in fact . . . 'told the assembled rabble what they must do' (i.e., attack the Capitol and disrupt the certification of the electoral vote count) and 'ratified their actions,' . . . he acted 'beyond [his] power' as President, . . . and his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability." *Id.* at *13. If, on the other hand, Mr. Sabol raises this issue not as a complete defense but rather in an attempt to show that he is not a danger to his community because he did not plan to participate in a violent attack on the U.S. Capitol and only did so because President Trump directed him and other

members of the crowd to do so that day, that argument also
fails. As Judge Royce Lamberth explained, even if a Capitol Riot
defendant "truly believes that the only reason he participated
in an assault on the U.S. Capitol was to comply with President
Trump's orders, this shows defendant's inability (or refusal) to
exercise his independent judgment and conform his behavior to
the law. These are not qualities of a person who can be trusted
on conditional release." *United States v. Chansley*, No. 21-cr-3
(RCL), 2021 WL 861079, at *10 (D.D.C. Mar. 8, 2021). This same
rationale applies, with even greater force, if Mr. Sabol was not
acting out of a perceived need to comply with the President's
orders but rather because he was simply "caught up
inappropriately in the moment." *See* Hr'g Tr., ECF No. 53 at
8:13-14.

*Third*, Mr. Sabol used a dangerous weapon, a police baton,
during the riot. Although he did not bring the baton with him to
the U.S. Capitol and claims he did not use it as a weapon once
he acquired it there, the fact that he took the weapon from a
vulnerable MPD officer and subsequently wielded it while helping
drag another officer into the violent mob where he sustained
prolonged beatings is sufficient for the Court to find that this
factor weighs against Mr. Sabol. Mr. Sabol admits that he
obtained the weapon after a "call to battle was announced."
Gov't's Opp'n, ECF No. 20 at 11. In view of Mr. Sabol's

33

admission that he "answered the call [to battle] because he was
a patriot warrior," *see id.*, and considering the context of the
moment at which Mr. Sabol snatched the baton from Officer A.W.—
as the officer was laying on his back in the midst of a brutal
physical assault from other rioters with little more than that
baton to protect himself, *see* Officer A.W. BWC Video Footage,
Ex. 2 to Gov't's Opp'n at 00:22 to 00:25—Mr. Sabol cannot
plausibly maintain that he stole the baton for any reason other
than to arm himself for "battle." Even if he believed that the
"battle" was started by Antifa as the "perfect set-up," *see*
Gov't's Opp'n, ECF No. 20 at 3; the Court is persuaded that he
forcibly took Officer A.W.'s baton to injure or intimidate
others—whether it was Antifa, law enforcement, members of
Congress, or anyone else he viewed as his enemy. Mr. Sabol even
admits that it was "evil" that made him snatch the baton. *Id.* at
10. Then, Mr. Sabol wielded the baton in one hand as he pushed
Officer B.M. down the U.S. Capitol steps with his other hand,
helping co-defendant Mr. Jack Wade Whitton feed the officer to
the crowd of rioters. *See* Storyful Video Footage, Ex. 3 to
Gov't's Opp'n at 00:14-00:22. During this encounter, Officer
B.M. was lying face-down, and Mr. Sabol held the baton against
the back of the officer's neck and back. *Id.* The video evidence
may not show Mr. Sabol striking the officer with the baton, but
it certainly shows him using it during this violent encounter.

Mr. Sabol's willingness to strip a vulnerable law enforcement officer of his weapon so he could use it to forcibly push another officer into a violent mob speaks to the gravity of the offenses with which he has been charged as well as the danger he poses not just to his community, but to the American public as a whole. *See Chrestman*, 2021 WL 765662, at *8.

*Fourth*, Mr. Sabol's words and movements during the riot indicate he acted deliberately and dangerously. In charging him under 18 U.S.C. §§ 111(a)(1) and (b), the grand jury charges Mr. Sabol with using a "deadly or dangerous weapon, that is, a baton, . . . to forcibly assault, resist, oppose, impede, intimidate, and interfere with" Officer B.M. while he was protecting the U.S. Capitol from violent rioters, many of whom were attempting to subvert a democratic election and prevent the peaceful transition of power. *See* Superseding Indictment, ECF No. 23 at 2. "It cannot be gainsaid that the violent breach of the [U.S.] Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community." *See Munchel*, 2021 WL 1149196, at *8. For purposes of evaluating a Capitol Riot defendant's dangerousness, the D.C. Circuit has drawn a distinction between Capitol Riot defendants who, like Mr. Sabol, engaged in violence at the U.S. Capitol on January 6, 2021, and those who, like the defendants in *Munchel*, did not. *See Munchel*,

35

2021 WL 1149196, at *8 ("[T]hose [rioters] who actually
assaulted police officers and . . . those who aided, conspired
with, planned, or coordinated such actions, are in a different
category of dangerousness than those who cheered on the violence
or entered the Capitol after others cleared the way."). In
*Munchel*, two Capitol Riot defendants had appealed the district
court's detention decision, and the D.C. Circuit remanded the
case for further consideration of the defendants' dangerousness.
*Id.* In so doing, the D.C. Circuit emphasized that the record
lacked evidence that the defendants committed any violence or
vandalized any property. *Id.* In comparison, "[g]rave concerns"
are implicated by Mr. Sabol's conduct, which included using
physical force to strip Officer A.W. of his police baton,
assisting other rioters in pulling Officer B.M. into the mob,
and assaulting Officer B.M. with the baton he had stolen from
Officer A.W. *See* Gov't's Opp'n, ECF No. 20 at 13 (citing
*Chrestman*, 2021 WL 765662, at *8). This conduct sets him apart
from other rioters who engaged with law enforcement but have
been granted pretrial release. *See, e.g.*, *Klein*, No. CR 21-236,
ECF No. 29 at 16, n.8 (distinguishing Mr. Klein's actions from
rioters who "clearly sought to incapacitate and injure members

of law enforcement," identifying Mr. Sabol specifically in that
comparison).

To the extent Mr. Sabol maintains that he was attempting to
help, not hurt, Officer B.M. when he joined other rioters in
pulling the officer down the U.S. Capitol steps and into the mob
while holding the stolen baton against the back of his neck, the
evidence tells a different story. The Court has reviewed the
chilling video footage provided by the government and Mr. Sabol.
The government's Exhibit 3 is a one-minute, 41-second clip of a
video posted by Storyful to YouTube.[10] In the video, a person in
a tan jacket wearing a green backpack and a dark helmet is seen
moving quickly up the U.S. Capitol steps through the large,
screaming crowd as rioters at the top of the steps are swinging
objects including a crutch and a hockey stick toward law
enforcement gathered under the U.S. Capitol's western terrace
archway. Storyful Video Footage, Ex. 3 to Gov't's Opp'n at
00:01-00:08. Mr. Sabol has confirmed to law enforcement that he
is that person. *See* Gov't's Opp'n, ECF No. 20 at 11. When Mr.
Sabol reaches the top of the steps, he then reaches toward the
ground before falling backwards down a few steps with a black
baton in his left hand. Storyful Video Footage, Ex. 3 to Gov't's

---

[10] *Available at* Storyful Rights Management, *Pro-Trump Protesters
Beat Police Officer Protecting Capitol Entrance*, YouTube (Jan.
10, 2021), https://www.youtube.com/watch?v=aEGthdTzedk.

Opp'n at 00:08-00:11. A few seconds later, another rioter at the
top of the steps wearing a grey backpack and white ball cap, who
has now been identified as Mr. Sabol's co-defendant Mr. Jack
Wade Whitton, appears to begin forcefully pulling an officer,
who is on the ground at that point, away from the archway and
into the mob. *Id.* at 00:14-00:19. Mr. Sabol seems to observe
this, and he moves back up the steps and joins Mr. Whitton in
dragging Officer B.M. face-first down the U.S. Capitol steps and
away from the other officers as rioters continue to relentlessly
swing and throw objects at the officers in the archway and at
Officer B.M. on the ground, all while members of the large crowd
yell and chant "U-S-A, U-S-A." *Id.* at 00:14-00:22. Mr. Sabol can
be seen using his left hand to push Officer B.M. down the steps
while he is bending over the officer and holding the black baton
in his right hand against the officer's back and neck. *Id.; see
also* Ex. 4 to Gov't's Opp'n, ECF No. 20 at 5. Seconds later,
another rioter repeatedly slams what appears to be a wooden
flagpole bearing the American flag toward the ground where
Officer B.M. seems to be laying, now in the middle of the crowd
on the steps. *See* Storyful Video Footage, Ex. 3 to Gov't's
Opp'n, at 00:23-00:28. The government's Exhibit 5A is a clip
from Officer C.M.'s BWC video footage that shows some of these
events from a different angle. Officer C.M. BWC Video Footage,
Ex. 5A to Gov't's Opp'n. In the video, officers gather under the

38

archway seemingly trying to fend off the throng of violent
protesters who are attacking them. *Id.* About halfway through the
clip, co-defendant Mr. Whitton is seen grabbing an officer's
head and lurching him forward over another officer who is laying
on the ground. *Id.* at 00:33-00:35. The government proffers that
those officers are B.M. and A.W., respectively. *See* Gov't's
Opp'n, ECF No. 20 at 5-6. Mr. Sabol comes into the frame at
about 35 seconds into the video. *See* Officer C.M. BWC Video
Footage, Ex. 5A to Gov't's Opp'n at 00:35; *see also* Ex. 5B to
Gov't's Opp'n, ECF No. 20 at 6. Although the events unfold
quickly, and the image of Mr. Sabol is choppy and occasionally
blocked as Officer C.M. appears to be jostled around and other
officers block the frame, Mr. Sabol can be seen helping push
Officer B.M. down the U.S. Capitol steps while holding the black
baton against Officer B.M.'s back and neck. Officer C.M. BWC
Video Footage, Ex. 5A to Gov't's Opp'n at 00:35-00:37.

The video evidence that Mr. Sabol submits to cast doubt on
the nefariousness of his conduct during Officer B.M.'s violent
attack is unconvincing, at least as it pertains to the Court's
consideration of the nature and circumstances of the charged
offenses and Mr. Sabol's request for pretrial release. Mr. Sabol
offers a one-minute, 36-second video of unknown origin as
Exhibit 2 to his motion. Video Footage, Ex. 2 to Def.'s Mot.,
ECF No. 17-2. He points out that "a voice can be heard" in the

video "urging others to not attack officers." Def.'s Mot., ECF
No. 17 at 3. An unnamed "witness" who "has known Mr. Sabol for
over 10 years . . . says the voice in the video is that of Mr.
Sabol." *Id.* At the April 8 hearing, Mr. Sabol also introduced a
second video exhibit that shows Mr. Sabol waving his hands
horizontally, in what he contends is a gesture a referee might
make to indicate action needed to stop, as other members of the
mob appear to be attacking law enforcement officers. *See* Hr'g
Tr. 40:5-11. In light of Mr. Sabol's exhibits, he argues "the
government's video is ambiguous as to whether the individual in
the video believed himself to be helping, rather than harming,
the officer B.M." Def.'s Mot., ECF No. 17 at 3.

The Court is not persuaded. The Court's review of the first
video reveals that Mr. Sabol's unnamed "witness" appears to be
mistaken in believing that the voice in the video heard telling
rioters not to attack the cops is Mr. Sabol's. A person begins
saying "Don't hurt the police" around 30 seconds into the video
clip. Video Footage, Ex. 2 to Def.'s Mot., ECF No. 17-2 at
00:30. At that point, Mr. Sabol is about three or four rows of
people away from the person who is filming. *Id.* He appears to be
moving forward further into the crowd toward the officers and is
positioned above other rioters, suggesting he is on a step or
other raised surface. *Id.* Seconds before a voice is heard
calling for other rioters not to hurt the police, a hand enters

40

the immediate foreground of the video holding a white Pyle
megaphone. *Id.* at 00:25. The megaphone is passed to a man
wearing a red shirt who is positioned right in front of the
person who is filming. *Id.* From there, it seems the man in the
foreground with the microphone wearing a red shirt, who is not
Mr. Sabol, is the person who repeatedly says "don't hurt the
cops," while a female voice also yells "don't hurt the cops" and
"stop it." *Id.* at 00:30-00:50. The second video does depict Mr.
Sabol waving his hands horizontally, as Mr. Sabol argues, but
there are no discernable statements made by Mr. Sabol in the
video that reveal what this gesture meant in the context of the
mob attacks on law enforcement. Moreover, the government avers
that the videos depict events that occurred approximately one
hour before the attacks on Officers B.M. and A.W., meaning that
even if the Court accepts Mr. Sabol's interpretation of the
events that transpired at that time, the assaults on law
enforcement for which Mr. Sabol is charged occurred an hour
later. Mr. Sabol's video evidence is therefore ineffective in
countering the government's proffer of video evidence that
depicts conduct intended to harm, rather than help, the MPD
officers, including: (1) taking Officer A.W.'s police baton by
force while the officer was laying on the ground after having
been attacked by other rioters, *see* Officer A.W. BWC Video
Footage, Ex. 2 to Gov't's Opp'n; and (2) helping drag Officer

41

Case 1:21-cr-00035-EGS Document 155-5 Filed 08/23/21 Page 42 of 64

B.M. away from his fellow officers and into the mob by using his left hand to push Officer B.M. down the steps while bending over him and holding Officer A.W.'s baton in his right hand against Officer B.M.'s back and neck. *See* Storyful Video Footage, Ex. 3 to Gov't's Opp'n at 00:14-00:22; Still Photo, Ex. 4 to Gov't's Opp'n, ECF No. 20 at 5; Officer C.M. BWC Video Footage, Ex. 5A to Gov't's Opp'n at 00:35-00:37; Still Photo, Ex. 5B to Gov't's Opp'n, ECF No. 20 at 6.

Finally, while Mr. Sabol's friends and family believe that this violent conduct is "out of character for him," *see* Def.'s Mot., ECF No. 17 at 4; those views expressed in character letters supporting Mr. Sabol, no matter how credible or persuasive, do not change the nature and circumstances of the offenses the grand jury has charged him with. The fact is that the grand jury determined that Mr. Sabol's conduct at the U.S. Capitol on January 6, 2021 supported not only charges for civil disorder, disorderly and disruptive conduct, and violent entry and disorderly conduct, but also assault on a federal officer with a deadly weapon. *See* Superseding Indictment, ECF No. 23.

The two remaining *Chrestman* factors—evidence of coordination with other rioters and whether the defendant assumed a leadership role in the assault—do not appear to be implicated in this case. The government has not proffered any evidence of Mr. Sabol communicating before, during, or after the

riot with anyone else in an attempt to amplify or assure the success of the U.S. Capitol breach. And while Mr. Sabol voluntarily admitted that when he arrived at the U.S. Capitol on January 6, 2021, he sought to be on the front line of the "battle," *see* Gov't's Opp'n, ECF No. 20 at 3; the government has not proffered any evidence that suggests Mr. Sabol urged other rioters to advance on the U.S. Capitol or attack law enforcement, other than his conduct, which arguably was leading by example.

Nonetheless, in view of all of these considerations, the Court is convinced that the nature and circumstances of Mr. Sabol's offenses evince a clear disregard for the law, an aversion to the fundamental tenets of our democracy, and a willingness to act violently when he believes he is "fighting tyranny," all of which indicate that he poses a danger to the community. *See Chrestman*, 2021 WL 765662, at *9. Accordingly, this factor weighs heavily in favor of detention on the basis that no condition or combination of conditions will reasonably assure the safety of the community. 18 U.S.C. § 3142(e)(1); 18 U.S.C. § 3142(g)(1). Likewise, in view of the substantial term of imprisonment to which Mr. Sabol is exposed for his offenses, this factor also weighs in favor of Mr. Sabol's continued detention on the basis that no condition or combination of

conditions will reasonably assure Mr. Sabol's appearance as required. *Id.; see also Chansley*, 2021 WL 861079, at *14.

### 2. **Weight of the Evidence Against the Defendant**

The second factor the Court must consider is the weight of the evidence against Mr. Sabol. 18 U.S.C. § 3142(g)(2).

As discussed *supra* Section III, Part B.1, Mr. Sabol submits video evidence that he believes lessens the effectiveness of the government's evidence against him. Video Footage, Ex. 2 to Def.'s Mot., ECF No. 17-2. He argues that these videos cast doubt as to whether he "believed himself to be helping, rather than hurting, the officer B.M." in the videos proffered by the government. Def.'s Mot., ECF No. 17 at 4.

The government, on the other hand, has proffered video evidence, cell phone evidence, physical evidence recovered from Mr. Sabol's vehicle, and testimonial evidence from Mr. Sabol himself in support of the charged offenses. The government describes the video evidence—Exhibits 2, 3, and 5A to the government's opposition—as "objective and unwavering." Gov't's Opp'n, ECF No. 20 at 14. The video evidence, according to the government, "shows precisely how [Mr.] Sabol stole Officer A.W.'s baton, and then dragged Officer B.M. into the violent crowd." *Id.* Cell phone records "corroborate the defendant's presence near the U.S. Capitol." *Id*. Physical evidence recovered from Mr. Sabol's vehicle includes Mr. Sabol's green backpack and

tan Carhartt jacket that he is seen wearing in the video exhibits during the attacks on the MPD officers. *Id.* Mr. Sabol also confirmed to law enforcement that he is the person in the video footage wearing that attire, and he confirmed that he took the baton of an officer who was laying on the ground. *Id.* The government contends that Mr. Sabol's "self-serving statements that he was trying to help officers" is shown by the video evidence to "clearly not [be] the case." *Id.*

For the reasons discussed more fully *supra* Section III, Part B.1, video footage clearly shows Mr. Sabol using physical force against Officer A.W. and physical force with a dangerous weapon against Officer B.M. in a manner that is inconsistent with Mr. Sabol's suggestion that he intended to help the officers. The government also confirmed Mr. Sabol's presence at the U.S. Capitol during the January 6, 2021 riots with cell phone records, and Mr. Sabol admitted he was present and identified himself to law enforcement as the person wearing a tan jacket, dark-colored helmet, and green backpack in the government's video and still photo exhibits. *See* Gov't's Opp'n, ECF No. 14 at 11, 14. Law enforcement recovered the jacket and backpack from Mr. Sabol's vehicle. *Id.* at 10, 14. And Mr. Sabol made numerous admissions to law enforcement that not only corroborate his presence at the U.S. Capitol and involvement in the assaults, but that shed light on his frame of mind and

45

motives. *See id.* at 3, 10-11 (proffering that Mr. Sabol told law enforcement officers that (1) there was no question the 2020 Presidential Election was stolen; (2) he "was fighting tyranny in the D.C. Capitol"; (3) during the riot, a "call to battle" was announced, and he "answer the call because he was a patriot warrior"; (4) it was "evil" that took the baton from Officer A.W. during the attack; and (5) he could not recall if he hit Officer B.M. with the stolen police baton because he was in a fit of rage).

In consideration of the strength of the government's evidence against Mr. Sabol and the lack of evidence presented to corroborate Mr. Sabol's self-serving statements that he did not intend to harm MPD officers during the siege on the U.S. Capitol, the Court finds that the second 18 U.S.C. § 3142(g) factor weighs against Mr. Sabol and in favor of his continued pretrial detention on the basis that no condition or combination of conditions will reasonably assure the safety of the community, *see Chrestman*, 2021 WL 765662, at *10; and on the basis that no condition or combination of conditions will reasonably assure Mr. Sabol's appearance as required, *see Chansley*, 2021 WL 861079, at *14 ("The overwhelming weight of

the evidence may further prompt defendant to flee and thus
weighs in favor of pre-trial detention.").

### 3. The History and Characteristics of the Defendant

Under the third factor, the Court must consider Mr. Sabol's
history and characteristics. 18 U.S.C. § 3142(g)(3). The Court
considers Mr. Sabol's "character, physical and mental condition,
family ties, employment, financial resources, length of
residence in the community, community ties, past conduct,
history relating to drug or alcohol abuse, criminal history, and
record concerning appearance at court proceedings," 18 U.S.C. §
3142(g)(3)(A); and "whether, at the time of the current offense
or arrest, [Mr. Sabol] was on probation, on parole, or on other
release, *Id.* § 3142(g)(3)(B).

Here, Mr. Sabol relies heavily on the character letters
submitted to the Court by his friends and family. Mr. Sabol
points out that his friends and family "say he is a peaceful and
nonviolent person" and he is a "responsible person who has
strong support from his friends and family." Def.'s Mot., ECF
No. 17 at 4. Those who wrote letters in support of Mr. Sabol's
release expressed surprise at the allegations against Mr. Sabol,
and they "indicate that it would be an aberration at the very
least," for probable cause for these offenses to exist. *Id.* at
4-5. In addition, Mr. Sabol has strong community ties in both
New York and Colorado—his family resides in New York, and he and

47

his long-time girlfriend live in Colorado. *Id*. at 4. Mr. Sabol asserts that he "volunteers in his community" and "takes an active role in his community by helping neighbors and friends when they need it." *Id.* Mr. Sabol has three children, and he states that he is "close with his family." *Id.* at 5. Mr. Sabol also has steady employment. He is a Senior Geophysical Manager at a company at which he has been employed for over six years, and before that he worked for two other companies for a combined total of 14 years. *Id.* Mr. Sabol is 51 years old. *Id.* Finally, he contends at "[a]t the time of his arrest, [he] had reached a mental breaking point," but he "has recovered from the episode and is focused on resolving this case responsibly." *Id.*

The government acknowledges that many letters of support have been written on Mr. Sabol's behalf and that Mr. Sabol does not have a criminal history. Gov't's Opp'n, ECF No. 20 at 15. However, the government returns to Mr. Sabol's actions on January 6, 2021, and in the days thereafter. "[T]he defendant's actions, as demonstrated by his apparent willingness to prepare for and engage in what he perceived to be a battle, weigh against his release," the government argues. *Id.* The government contends that he engaged in this violent behavior, which included assaulting police officers, because he did not believe the results of the 2020 Presidential Election were valid, and "[i]f released, [he] would have even more opportunities to

48

unleash violence against those in 'battle' against him." *Id.*
Moreover, the government points out that Mr. Sabol has already
admitted to "succeed[ing] in destroying evidence and asked
others to delete incriminating videos he made," and that he
would have more opportunities to "obstruct the proceedings
against him" in this manner if he were released. *Id.*

In consideration of all pertinent information presented by
the parties concerning Mr. Sabol's history and characteristics,
the Court is persuaded that this factor weighs against Mr. Sabol
and in favor of his continued pretrial detention. The Court
agrees with the government that Mr. Sabol's willingness to act
violently during what he perceived to be a "battle" and a fight
against tyranny is extremely troubling. *See* Gov't's Opp'n, ECF
No. 20 at 15. That he acted violently against law enforcement
protecting the peaceful transition of power based on a belief
that the 2020 Presidential Election was stolen is also very
alarming. *Id.* This recent conduct indeed raises concerns about
Mr. Sabol's character and the danger Mr. Sabol may present to
the community if he were released. *See Chrestman*, 2021 WL
765662, at *14.

To Mr. Sabol's credit, however, his friends and family
appear to think very highly of his character, and their letters
asking for his release from custody are both credible and
persuasive. *See* Character Letters, Ex. 1 to Def.'s Mot., ECF No.

17-1. Thirty family members and individuals were willing to write letters on Mr. Sabol's behalf, which is indicative of Mr. Sabol's ability to establish and maintain strong, meaningful relationships. The letters also demonstrate that Mr. Sabol's social circle includes individuals with political viewpoints different than his own, as well as a law enforcement officer, former military officers, and a practicing attorney working for a federal government agency. Despite the nature and circumstances of his charges, these individuals were willing to write letters to the Court on his behalf. *See* ECF No. 17-2 at 6-7, 9, 11, 20, 31. As Mr. Sabol points out, many of the people who wrote letters expressed their surprise that Mr. Sabol could have engaged in the type of conduct with which he has been charged because it is inconsistent with his peaceful and nonviolent nature and his respect for law enforcement. *See, e.g., id.* at 2 ("Never would I characterize Jeff as someone who would hurt others. Never. He is the peacekeeper. He is that guy who steps in and breaks up a fight, not the participant. The events, of January 6 are completely inconsistent with Jeff and how he has lived his life."); 4 ("He is the most honest, peaceful, non violent person I have ever met. He is loving, giving, and always willing to help others."); 10 ("When I heard the news . . . I was in shock. The Jeff Sabol that I know is not a violent man or an instigator at all."); 11 ("His respect for

50

both law enforcement and our military have always been not just laudable, but exemplary."); 18 ("Never in the years that I have known him have I ever heard Jeff talk about starting violence . . . We have all seen videos from January 6th and I cannot imagine the friend I volunteered with participating in that violence."); 20 ("I cannot explain his presence at the Capitol on January 6, and I disagree strongly with the notion that the 2020 presidential election was 'stolen,' but Jeff is—without exaggeration—the last person I would expect to harm a police officer."); 31 ("The portrayal of Jeff by the media is inconsistent with the good moral character of the Jeff I know. Of all people, I understand the seriousness of this incident, especially as it relates to my Brother's in Blue; however, I hope the court will show some leniency on Jeff Sabol.").

The letters also confirm that Mr. Sabol is an active volunteer in his community, he regularly helps people in need, and he cares deeply about his family. *See* Def.'s Mot., ECF No. 17 at 4-5. Other factors the Court notes in Mr. Sabol's favor are that he has maintained steady employment for decades and has no criminal history. *See id.* Altogether, these factors have persuaded the Court that Mr. Sabol's nature and characteristics are inconsistent with a person who would present a danger to his community if released, though it is a very close call given the severity of his offenses and the extremely troubling conduct he

51

displayed at the U.S. Capitol on January 6, 2021. *See Cua*, 2021 WL 918255, at *4-*5.

But the Court's inquiry is not finished. In addition to considering these factors in relation to the danger Mr. Sabol may pose to his community if released, the Court must also consider Mr. Sabol's history and characteristics in relation to his flight risk. *See* 18 U.S.C. § 3142(g); *Chansley*, 2021 WL 861079, at *14-*15. The government has proffered evidence regarding Mr. Sabol's past attempts to avoid prosecution that cannot be ignored. In the days after January 6, 2021, Mr. Sabol planned an escape to Switzerland where he believed he could avoid extradition for his criminal offenses. Gov't's Opp'n, ECF No 20 at 9. To effectuate that plan, he traveled from Colorado to Boston and was at the airport before abandoning the plan when he believed law enforcement had spotted him. *Id.* He then drove from Boston to New York where he was ultimately located by local law enforcement in New City, New York. *Id.* at 10. Among the items found in his car were his passport and an airline e-ticket. *Id.* And regrettably, Mr. Sabol's mental and emotional state was such that he had attempted to take his own life. *Id.* When found by local law enforcement in New City, he was covered in blood and suffering from severe self-inflicted lacerations. *Id.* Mr. Sabol asserts that he had "reached a mental breaking point," but he "has recovered from the episode and is focused on

resolving this case responsibly." Def.'s Mot., ECF No. 17 at 5.
The Court sincerely hopes that is true. But the Court cannot
ignore that Mr. Sabol presents a flight risk nonetheless.
Considering the steps he took to flee to Switzerland to avoid
arrest, Mr. Sabol is the epitome of a flight risk. The Court is
unpersuaded by Mr. Sabol's argument, made at the April 8
hearing, that he only wanted to go to Switzerland for a short
time to give himself an opportunity to find video evidence to
counter the videos that were being circulated by the media at
the time. Hr'g Tr., ECF No. 53 at 9:2-21. For one thing, before
traveling to Boston, Mr. Sabol engaged in the destruction of
evidence—having "fried" electronic devices at his home, directed
an associate to delete incriminating video evidence, and
destroyed anything that could be construed as antigovernment.
*See* Gov't's Opp'n, ECF No. 20. The fact that he destroyed
evidence is inconsistent with the behavior of someone trying to
legitimately and honestly clear their name; instead, it is
consistent with someone trying to avoid prosecution. In
addition, the Court cannot condone a criminal defendant's
attempt to circumvent the criminal justice system and
independently clear their name from the safety of a perceived
non-extradition country. Mr. Sabol's attempted flight and his
destruction of evidence that could be used against him in a

53

criminal prosecution unquestionably weighs against pre-trial release. *See Chrestman*, 2021 765662, at *14-*15.

In sum, the Court finds that the third Section 3142(g) factor weighs in favor of Mr. Sabol and against his continued pretrial detention on the basis that no condition or combination of conditions will reasonably assure the safety of the community, but only by a slim margin. *See Cua*, 2021 WL 918255, at *4-*5. However, the Court finds that this factor weighs strongly against Mr. Sabol and in favor of his continued pretrial detention on the basis that no condition or combination of conditions will reasonably assure his appearance as required. *See Chrestman*, 2021 WL 765662, at *14-*15. As a result, the Court concludes that this factor weighs against Mr. Sabol and in favor of his continued pretrial detention overall. *See* 18 U.S.C. § 3142(g). *Cf. Chrestman*, 2021 WL 765662, at *15 (concluding that the defendant's history and characteristics weighed in favor of pretrial detention where defendant posed a clear danger

to the community, but his risk of flight was minimal, though not
zero).

### 4. The Nature and Seriousness of the Danger Posed by Defendant's Release

The final factor the Court must consider is the "nature and
seriousness of the danger to any person or the community that
would be posed by the person's release." 18 U.S.C. § 3142(g)(4).

Mr. Sabol states that although the charge for assaulting a
federal officer with a deadly weapon carries a maximum penalty
of 20 years, "none of the offenses have mandatory minimums."
Def.'s Mot., ECF No. 17 at 5. In his motion, Mr. Sabol states
that, if released, he would return to Colorado, which is "a long
distance from the location of the alleged crime and victims, who
are strangers to Mr. Sabol, in this case." *Id.* In Colorado and
elsewhere, he has "a long record of living as a productive and
positive member of society." *Id.* At the April 8 hearing, Mr.
Sabol presented an alternative release plan: he would live in
Waterville, New York under house arrest and subject to
electronic GPS monitoring in a home owned by his girlfriend that
is next door to his parent's residence, under the supervision of
the probation office in the Northern District of New York. Hr'g
Tr., ECF No. 53 at 14:5-15:24. Finally, Mr. Sabol points out
that the "pretrial service report in New York recommended
release on an unsecured bond with conditions to include

surrendering his passport, GPS monitoring, and restricted travel to his home and the District of Columbia for court." Def.'s Mot., ECF No. 17 at 5. For these reasons, he argues, "[r]elease with strict conditions is appropriate in this case." *Id.*

The government raises concerns about both Mr. Sabol's danger to the community based on his actions on January 6, 2021, as well as his risk of flight based on his effort to flee the country and his attempt to take his own life when he believed he was under FBI investigation. *Id.* at 15-16. With respect to the danger Mr. Sabol poses to the community if released, the government again emphasizes that Mr. Sabol used physical force against MPD officers. *Id.* at 15. Again, rioters, with the assistance of Mr. Sabol, dragged Officer A.W. and Officer B.M. from their post outside the U.S. Capitol into a violent mob, not only subjecting the officers to severe physical danger but also preventing them from tending to a wounded protestor who had been crushed by the mob and subsequently died of her injuries. *Id*. at 15-16. Moreover, "[t]he charged offenses involve assaultive conduct aimed to stop the functioning of the United States government, specifically to derail the certification of the electoral process, a cornerstone of our democracy." *Id.* at 15. With respect to Mr. Sabol's risk of flight, the government points out that he has already attempted to avoid prosecution by drastic means, and now, considering the evidence and charges

against him, which expose him to a significant term of imprisonment, "he has an even more compelling incentive to flee." *Id.*

For many of the reasons already addressed above, the Court finds that this factor also weighs against Mr. Sabol and in favor of his continued pretrial detention. "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," requiring an "open-ended assessment of the 'seriousness' of the risk to public safety." *Cua*, 2021 WL 918255, at *5 (quoting *United States v. Taylor*, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)). "Because this factor substantially overlaps with the ultimate question whether any conditions of release 'will reasonably assure [the appearance of the person as required] and the safety of any other person and the community,' 18 U.S.C. § 3142(e), it bears heavily on the Court's analysis." *Id.*

As discussed in detail above, the nature and circumstances of Mr. Sabol's offenses evince not just a clear disregard for the safety of others and law enforcement in particular, but also a willingness to engage in "battle" when he believes he is "fighting tyranny." *See supra* Section III, Part B.1; *see also Chrestman*, 2021 WL 765662, at *9. On January 6, 2021, that "battle" took place at the U.S. Capitol, and Mr. Sabol's role in it resulted in two MPD officers being wounded and a protester

57

dying after not receiving needed medical care because the MPD officers were prevented from coming to her aid. *See* Gov't's Opp'n, ECF No. 20 at 15. Though Mr. Sabol suggests that he may not have intended to hurt Officer A.W. and Officer B.M. during the riot, the Court carefully reviewed Mr. Sabol's video evidence alongside the government's video evidence and concluded that the Court cannot construe Mr. Sabol's video as supporting his claim at this juncture. *See supra* Section III, Part B.1. The Court does acknowledge that the character letters sent on Mr. Sabol's behalf are compelling. The letters provide the Court with a longer and fuller view of Mr. Sabol's life and character, and the Court appreciates that based on those letters, it appears that his character is inconsistent with the chilling behavior he displayed on January 6, 2021. *See supra* Section III, Part B.3. But a lifetime view of Mr. Sabol's history and characteristics is not the only consideration when determining whether today Mr. Sabol poses a danger to his community if he were to be released pending trial. *See* 18 U.S.C. § 3142(g). His history of a productive and peaceful life did not prevent him from committing horrific acts on January 6, 2021, and those acts inform the Court's view of his propensity for further violence if he were to be released pending trial.

In determining whether Mr. Sabol poses a danger to his community, neither the video evidence offered by Mr. Sabol nor

58

the character letters submitted on his behalf outweigh the fact that he displayed an extremely troubling disregard for the law and an aversion to the fundamental tenets of our democracy based on what appears to be a sincerely held, but tremendously misguided, belief that he was acting valiantly and patriotically to fight against a tyrannical government that "stole" a presidential election. And Mr. Sabol did not simply hold these misguided beliefs; he acted on them. He traveled across the country to the U.S. Capitol equipped with battle gear. When "called," he stepped up to battle because he believed himself to be "a warrior." To arm himself, he stripped a vulnerable police officer of his police baton. He then used that stolen police baton to force another officer away from his post and into a mob of rioters who proceeded to viciously attack him, leaving him bleeding from the head. Mr. Sabol himself has admitted much of this, and the weight of the evidence against him is strong. For these reasons, the Court is convinced that Mr. Sabol would pose a danger to his community and the broader community of American citizens if he were to be released pending trial.

The Court reaches this conclusion having considered, as it must, whether the danger Mr. Sabol poses to the community is concrete and continuing. *See Munchel*, 2021 WL 1149196, at *4 ("[A] defendant's detention based on dangerousness accords with due process only insofar as the district court determines that

59

the defendant's history, characteristics, and alleged criminal
conduct make clear that he or she poses a concrete, prospective
threat to public safety."). While the circumstances of January
6, 2021 were unique, and the day has passed, it cannot be said
that every Capitol Riot defendant is no longer a danger because
those exact circumstances are unlikely to arise again. The D.C.
Circuit certainly did not say as much; instead, the court
observed that for the defendants in that case who "did not
vandalize any property or commit violence, the presence of the
group was critical to their ability to obstruct the vote and to
cause danger to the community." *Id*. at *8. Mr. Sabol, on the
other hand, did commit acts of violence. In this regard, Mr.
Sabol is also different from Capitol Riot defendants like Mr.
Frederico Klein who engaged in "forceful conduct" but did not
direct that conduct toward inflicting injury. *See Klein*, No. CR
21-236, ECF No. 29 at 24 ("[Mr. Klein's] most forceful conduct
was directed to advancing and maintaining the mob's position in
the tunnel, not toward inflicting injury, and outside that
context, the nature of his actions and the force that he
employed would not have had the same effect."). The Court is
also influenced by Mr. Sabol's admissions to law enforcement
which were made after the events of January 6 and reflect what
motivated him to engage in violence. Thus while it may be true
that some Capitol Riot defendants no longer pose a threat to the

community because the unique circumstances of January 6 have passed and "the specific concerns in the wake of the January 6 events over future protests and violent attacks on the government . . . have dissipated to some degree now three months later," *see Klein*, No. CR 21-236, ECF No. 29 at 25; the Court finds that the presence of the group at the U.S. Capitol was not necessary for Mr. Sabol to cause danger to the community. He appears to have been motivated to act violently that day not solely by the presence of the group or President Trump's encouragement, but also by his belief that he is a "warrior" in a fight against perceived tyranny, and there is ample reason to believe that fight is not finished for Mr. Sabol and others like him, making the threat of further violence present, concrete, and continuing. *See* Mark Niquette, *Trump Rips Into Mitch McConnell in Speech to Party Donors*, Bloomberg (Apr. 10, 2021), https://www.bloomberg.com/news/articles/2021-04-10/trump-touts-appeal-to-new-voters-as-path-for-gop-return-to-power (reporting that former President Trump repeated false claims about the 2020 Presidential Election being stolen and criticized former Vice President Pence for not rejecting the certification of the election results); David Jackson, *"Radical Left CRAZIES:" Trump issues Easter greetings by attacking political rivals, griping about election loss*, USA Today (Apr. 4, 2021) (reporting on a written statement issued by former President Trump that stated,

"Happy Easter to ALL, including the Radical Left CRAZIES who rigged our Presidential Election, and want to destroy our Country!").[11]

Moreover, a danger exists that, if released, Mr. Sabol may again try to flee or otherwise attempt to prevent his prosecution from moving forward. *See supra* Section III, Part B.3. When Mr. Sabol tried to flee previously, he feared being caught by the FBI. Now Mr. Sabol is facing a potential twenty-year prison sentence for assaulting Officer B.M. with a deadly weapon and is charged with seven other felony and misdemeanor offenses. *See* Superseding Indictment, ECF No. 23. As noted, the evidence against him is strong. And he has already destroyed incriminating evidence and directed others to do so as well.

Finally, releasing Mr. Sabol from custody and allowing him to return to Colorado or move to New York with strict conditions of home incarceration, as Mr. Sabol proposes and as he says the Pretrial Services Agency in New York recommended, would be insufficient to mitigate Mr. Sabol's danger to the community and the risk that he would flee or try to obstruct justice. Mr.

---

[11] The Court takes judicial notice of the existence of news articles. *See Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) ("[A] court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized [certain facts]."); *Agee v. Muskie*, 629 F.2d 80, 81 n.1, 90 (D.C. Cir. 1980) (taking judicial notice of facts generally known as a result of newspaper articles).

Sabol argues that in Colorado he would be "a long distance from the location of the alleged crime and victims, who are strangers to Mr. Sabol." Def.'s Mot., ECF No. 17 at 5. The same could be said of home confinement in New York. But Mr. Sabol was in Colorado before he committed the instant offenses. He was in Colorado with his girlfriend, not in Washington D.C., when he planned his participation in the protests; when he acquired the tactical gear he brought with him to the U.S. Capitol; and when he developed the beliefs that ultimately led him to the U.S. Capitol on January 6, 2021. Mr. Sabol's actions demonstrate that he is willing to follow his beliefs, and act on them violently, no matter how far they take him from his home and no matter what "strangers" are on the other side of the "battle" he intends to wage in violation of the laws designed to protect our democracy. While the Court appreciates that living in New York with his girlfriend and near his family may provide him the type of support and oversight needed to improve his mental health conditions, the Court is not persuaded that this proposed home confinement plan would mitigate his continued danger to the community based on his demonstrated willingness to engage in violence in furtherance of his beliefs and in a perceived battle against tyranny. As was true in *Chrestman*, "[t]ogether, these factors demonstrate that he cannot be trusted to abide by any

63

conditions of release that might be imposed instead of pretrial detention." 2021 WL 765662, at *16.

## IV. Conclusion

After considering the factors set forth in 18 U.S.C. § 3142(g), the Court finds, by clear and convincing evidence, that no condition or combination of conditions will reasonably assure the safety of any other person and the community were Mr. Sabol to be released pending trial. 18 U.S.C. § 3142(e)(1). The Court further finds, after considering the factors set forth in 18 U.S.C. § 3142(g) and by a preponderance of the evidence, that no condition or combination of conditions will reasonably assure Mr. Sabol's appearance as required if he were to be released pending trial. *Id.* Accordingly, Mr. Sabol's Motion for Pretrial Release, is **DENIED**. An appropriate Order accompanies this Memorandum Opinion.

      **SO ORDERED.**

Signed:              */s/*
                **Emmet G. Sullivan**
                **United States District Judge**
                **April 14, 2021**