**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21 Cr. 35 (RC)** |
| **JEFFREY SABOL,** | **REDACTED** |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jeffrey Sabol to a term of incarceration of 121 months, three years of supervised release, $32,165.65 in restitution, and the mandatory $100 special assessment for each count of conviction.

### I.     INTRODUCTION

On January 6, 2021, the defendant, Jeffrey Sabol, participated in the attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Sabol played an active role on the Capitol grounds for hours on January 6.   Outfitted in a helmet, Sabol was on the front line of rioters ramming into the police line on the West Plaza between 2:04 p.m. and 2:33 p.m.   Sabol played a key role in helping the rioters break through the police line at the West Plaza.   He entered the fray with the intent to halt the certification of the electoral college vote and to violently combat what he believed was a stolen election.   Sabol's crimes culminated in a violent attack by him and his co-defendants at the Lower West Terrace ("LWT") of the United States Capitol Building.   While there, Sabol and his co-defendants assaulted a line of police officers who were positioned in an archway (the "Archway") at the front of a passageway that led to the interior of the building (the "Tunnel").   During the course of this attack, which occurred between 4:27 p.m. and 4:29 p.m., Sabol ripped the baton out of the hands of a fallen officer, leaving him unable to defend himself against assaults by other rioters.   Sabol then helped his co-defendants drag a second officer into the crowd, where that officer was also beaten by rioters.

For his behavior on January 6, 2021, the Government recommends that the Court sentence Sabol to 121 months' incarceration for violating 18 U.S.C. §§ 1512, 111(a) and (b), 2111, a sentence at the midpoint of the advisory Guidelines range of 108-135 months.   Such a sentence reflects the seriousness of Sabol's criminal conduct.

## II.        FACTUAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The Government refers the Court to the stipulated Statement of Offense filed in this case, ECF 351, for a short summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B. Background on Rioters' Assault on and Breach of Police Lines on the West Plaza**

On January 6, 2021, the outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]"   These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd pushing those barricades at the Peace Circle over and advancing into the restricted area to engage with United States Capitol Police ("USCP") officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were assaulted and shoved out of the way by the mob. By 12:58 p.m., the rioters had crossed the additional barriers and flooded onto the West Plaza, pushing against the barricade there.



*Image 1: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

The crowd quickly pushed through this fencing and for the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Image 2: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, augmented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., MPD officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them, as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.

By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front, and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.

### C. Background on Rioters' Assaultive Conduct in the Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th

Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

Many of the most violent confrontations on January 6, 2021, occurred near an entrance to the U.S Capitol Building in the area known as the LWT. The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long, *i.e.*, the "Tunnel." That Tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the Tunnel is framed by the stone Archway, that is a visual focal point at the center of the West Front of the Capitol Building, as circled in red below.



*Image 3*[2]

---

[2] Image 3 is taken from "Inauguration at the U.S. Capitol," Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

On January 6, 2021, when rioters arrived at the doors behind this Archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the USCP, assisted by officers from the MPD, were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles, and other items. Officers created a line in the doorway to block the rioters and in turn physically engaged them with batons and OC spray.

The violent battle for control over the Archway and the Tunnel continued for more than two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers, engaging them in intense hand-to-hand combat. Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions at around 5:00 p.m. The actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including members of Congress.

### D.     Jeffrey Sabol's Role in the January 6, 2021 Attack on the Capitol

*Sabol's Preparations for January 6, 2021*

On January 4, 2021, Sabol traveled from his home in Colorado to Washington, D.C., with several other individuals who were members of what Sabol described as a "neighborhood watch" group (the "Group").   Prior to leaving, members of the Group discussed what to bring with them. On the advice of one member of the Group, Sabol packed a helmet, a trauma kit, a buck knife, and zip ties.   The Group also brought radios with them, which Sabol and others used to attempt to communicate with each other on January 6, 2021.

On January 6, 2021, Sabol and other members of the Group attended the "Stop the Steal" rally at the Ellipse and watched then-President Donald Trump speak.   Sabol stayed for at least a portion of the speech, then he and at least one other member of the Group walked towards the Capitol building.   As they approached, Sabol observed that, in his words, "a battle was already going on" and heard munitions (which Sabol believed were flashbangs) in the distance.   At some point, Sabol separated from the individual he was with and joined the rioters on the West Plaza.

*Sabol's Assaults on Law Enforcement at the West Plaza*

By at least 2:00 p.m., a line of police officers, including USCP and MPD officers, was positioned on the West Plaza of the Capitol building to stop the rioters from advancing.   Many of the officers in the line carried riot shields.   Sabol put himself at the front line of rioters confronting the police.   At approximately 2:04 p.m., in a coordinated effort, Sabol and another rioter pushed a third rioter—who himself was holding a riot shield[3]—from behind, propelling him forward and up a set of steps, so that the rioter with the shield ran into the line of police officers.   *See* Exhibits

---

[3] The rioter holding the riot shield is Jonathan Pollock, who has been charged in *United States v. Pollock, et al.*, 21 Cr 447 (CJN).

1 and 2.   As the officers attempted to repel the rioters pushing against the police line, Sabol kept

pushing forward and slammed into a riot shield held by MPD Officer M.T.   *See* Exhibits 2-4.

Sabol kept pushing against the line of officers until a USCP officer pushed him back, causing

Sabol to fall down a set of steps. *See* Exhibit 3 at 00:1-00:18.



*Exhibit 1 (at 00:03)[4] – Sabol (circled in red) and another rioter (wearing a red hat and blue jacket) push a third rioter (wearing camouflage print and a black hat) up a set of steps and into the line of police officers on the West Plaza of the U.S. Capitol building*

---

[4] Exhibit 1 is an excerpt from a longer video, available at https://www.youtube.com/watch?v=QrG6_Pz9GyM.



*Exhibit 2 (at 00:30)[5]  - Sabol (circled in red) and another rioter push a third rioter up a set of steps and into the line of police officers on the West Plaza of the U.S. Capitol building*

 

*Exhibit 3 (at 00:12, 00:13)[6]  – Sabol (red arrow) continuing to push against the police line*

---

[5] Exhibit 2 is an excerpt from the body-worn camera footage of MPD Officer A.P., who was positioned on the West Plaza of the Capitol.

[6] Exhibit 3 is an excerpt from the body-worn camera footage of MPD Officer J.M., who was positioned on the West Plaza of the Capitol.



*Exhibit 4 (at 00:13)[7] - Sabol (red arrow) slams into the riot shield held by MPD Officer M.T.*

Approximately half an hour later, at 2:27 p.m., Sabol had returned to the front line of rioters confronting police on the west side of the Capitol building.   While there, Sabol again ran towards the line of officers and, in an attempt to break through the line, used two hands to push against a riot shield held by one of the officers   *See* Exhibit 5.

---

[7] Exhibit 4 is an excerpt from the body-worn camera footage of MPD Officer M.T., who was positioned on the West Plaza of the Capitol.



*Exhibit 5 (at 00:07)[8] - Sabol (circled in red) charges the line of police officers on the south side of the West Plaza of the Capitol building*

At this time, Sabol and the other rioters succeeded in breaking through the police line. Over the next few minutes, the police were forced to fall back and rioters flooded onto the south side of the West Plaza.




*Exhibit 6A*
*West Plaza at approx. 2:27:25 p.m.*

*Exhibit 6B*
*West Plaza at approx. 2:27:55 p.m.*

---

[8] Exhibit 5 is an excerpt from the body-worn camera footage of MPD Officer H.F., who was positioned on the West Plaza of the Capitol.



*Exhibit 6C*
*West Plaza at approx. 2:28:25 p.m.*



*Exhibit 6D*
*West Plaza at approx. 2:28:55 p.m.*



*Exhibit 6E*
*West Plaza at approx. 2:29:13 p.m.*



*Exhibit 6F*
*West Plaza at approx. 2:34:57 p.m.*

   The rioters backed the police up against the wall supporting the inaugural stage.   During the rioters' continued attacks on police, at approximately 2:33 p.m., Sabol saw two other rioters attempting to pull an officer's baton away from him.   Sabol reached in to assist the rioters.   *See* Exhibit 7 at 00:20. Approximately 30 seconds later, Sabol and another rioter grabbed at a helmet-visor held by an MPD officer.   *See* Exhibit 7 at 00:53.   Sabol and the other rioter engaged in a tug of war with the officer over the visor; the officer was able to retain possession of the visor.

 

*Exhibit 7 (at 00:20)[9] - Sabol (circled in red) attempts to pull a baton away from an MPD officer*

*Exhibit 7 (at 00:53) - Sabol (circled in red) attempts to grab a visor from an MPD officer*

*Sabol's Assaults on Law Enforcement at the Lower West Terrace*

Over the next two hours, Sabol ascended from the West Plaza to the entrance to the Tunnel. He climbed the stairs that ran under the scaffolding on the southwest side of the Capitol building and, by approximately 3:20 p.m., was present in the mob on the LWT as MPD Officer M.F. was pulled off of the police line and into the crowd by rioters.

---

[9] Exhibit 7 is an excerpt from the body-worn camera footage of MPD Officer H.F., who was positioned on the West Plaza of the Capitol.



*Exhibit 8[10] – Sabol (circled in red) watches as rioters surround
Officer M.F. (circled in yellow) on the LWT*

While on the LWT, Sabol filmed a "selfie video," which depicted Sabol immediately after he had been pepper sprayed and in which Sabol stated that he just been "gassed" and "pepper sprayed" and had "tried to rush the front gate, the front door," and then turned the camera to film the crowd on the steps leading up to the Archway.   *See* Exhibit 9.

Starting at approximately 4:27 p.m., MPD Officer A.W. was positioned toward the opening of the Archway when co-defendant Justin Jersey charged at Officer A.W., grabbing his face, and knocking Officer A.W. to the ground.   While Officer A.W. was lying supine on the ground of the Archway attempting to defend himself, Sabol reached for Officer A.W.'s baton, grabbed it, and ripped it out of Officer A.W.'s hands.   *See* Exhibit 10 at 00:26-00:30, Exhibit 10.1 at 00:46-00:52.[11]   Sabol used such force in wresting the baton from Officer A.W.'s grasp that Officer

---

[10]  Exhibit 8 is a still image from a video available at https://ia802309.us.archive.org/ 33/items/sf4kaTrpe9SSQ4YAp/sf4kaTrpe9SSQ4YAp.mpeg4.

[11]  Exhibit 10 is an excerpt from the body-worn camera footage of MPD Officer A.W., who was positioned at the entrance to the Tunnel.   Exhibit 10.1 is a slowed excerpt of Exhibit 10.

A.W.'s torso was lifted up and forward as Sabol pulled the baton, and, once Sabol succeeded in taking the baton from Officer A.W., Sabol fell backwards down the steps of the LWT, still holding the stolen baton.  *See* Exhibit 11[12] at 00:07-00:11; Exhibit 10 at 00:26-00:30; Exhibit 12[13] at 00:11-00:15.



*Exhibit 10 (at 00:27) - Sabol's hands (circled in red) reach towards Officer A.W.'s baton. Officer A.W. is lying on his back on the ground; his body-worn camera is facing up towards the top of the Archway.*

---

[12] Exhibit 11 is video footage filmed by an individual positioned on the LWT.

[13] Exhibit 12 is an excerpt from the body-worn camera footage of MPD Officer D.P., who was positioned at the entrance to the Tunnel.







*Exhibit 10 (at 00:28) - Sabol (circled in red) and Officer A.W. struggle over Officer A.W.'s baton.   Officer A.W. is wearing a neon-yellow MPD-issued jacket; his arms are in the foreground.   As Sabol pulls the baton, the view from Officer A.W.'s BWC changes from facing the top of the Archway to facing the LWT indicating that his torso has rocked forward.*

While A.W. was on the ground, co-defendant Jack Wade Whitton climbed over a railing and began striking at MPD Officer B.M. with a crutch.   Whitton then kicked at Officer A.W., then, as Sabol watched, grabbed Officer B.M., first by his baton, then by the helmet and the neck of his ballistic vest, pulled him down over Officer A.W., and started to drag him down a set of steps in a prone position.   Sabol rushed back up the LWT steps, moved towards the Archway, and assisted Whitton and co-defendant Logan James Barnhart in dragging Officer B.M. down the steps, holding Officer A.W.'s baton against Officer B.M.'s back.   *See* Exhibit 12 at 00:20-00:28; Exhibit 13 at 0:34-00:38; Exhibit 14.   Once Officer B.M. was dragged fully into the crowd, other rioters, including co-defendants Peter Stager and Mason Courson, beat Officer B.M. with weapons, including a flagpole and a baton.

 

*Exhibit 13 (at 00:34, 00:36)[14] - Sabol (circled in red) pulling Officer B.M.
down the steps head first.*



*Exhibit 14- Sabol (circled in red) assists Whitton and Barnhart in dragging
Officer B.M. into the mob below.*

---

[14] Exhibit 13 is an excerpt from the body-worn camera footage of MPD Officer C.M., who was positioned at the entrance to the Tunnel. Exhibit 13.1 is a slowed excerpt of Exhibit 13.

Meanwhile, without his baton, Officer A.W. was unable to defend himself from further attacks.   Co-defendant Ronald Colton McAbee grabbed at Officer A.W.'s torso, while co-defendant Clayton Ray Mullins grabbed one of Officer A.W.'s legs and the two engaged in a tug-of-war with officers who were trying to pull Officer A.W. back into the Archway.   Eventually, McAbee pulled Officer A.W. out of the Archway and the two slid down a set of stairs and into the crowd together, with McAbee on top of Officer A.W. and pinning Officer A.W. down.   As he was dragged into the mob, Officer A.W. was kicked, struck with poles, and stomped on by several individuals.   In addition, his gas mask was ripped off and he was maced by the rioters.

### Officer A.W.'s Injuries

With the assistance of another individual in the mob, Officer A.W. managed to return to the Archway.   Once back in the Tunnel, another officer realized that Officer A.W. was bleeding profusely from his head.   Officer A.W. was escorted to the east side of the Capitol building before being taken to the hospital.   At the hospital, Officer A.W. was treated for a laceration on his head, which required two staples to close.   He also sustained bruising on multiple areas of his body, including contusions on his elbow.   Due to his injuries, Officer A.W. was off duty until May 2021, when he returned to limited duty.   Officer A.W. did not return to full duty until July 2021.

### Officer B.M.'s Injuries

As a result of the attacks described above, Officer B.M. sustained physical injuries including bruising and abrasions.   In an interview conducted after the assault, Officer B.M. later described his injuries to the Federal Bureau of Investigation ("FBI") as visible bruising to his arms, face, and legs.   The bruises were black and blue in color and were sore and painful, consistent with being hit by a metal pipe.   Officer B.M. also had scratches on his knees.   While Officer B.M. did not immediately seek medical attention and eventually rejoined his fellow officers on the police

line, it is clear from video footage that as a result of the assaults, Officer B.M. had difficulty walking and moving on his own.   Some of the individuals around him supported his weight as they attempted to guide him away from the mob.   *See* Exhibit 11 at 01:20-02:31.

*Sabol's Conduct Following the January 6, 2021 Capitol Riot*

In the days following January 6, 2021, Sabol became concerned that he would be arrested for his conduct on that day.   He therefore deleted text messages and other communications, including text message between members of the Group.   He also asked another individual to delete the video that Sabol had sent that individual.[15]   Sabol also destroyed materials in order to prevent the government from finding them.   Among other things, he microwaved laptops and hard drives and dropped his cell phone into a body of water.   He also booked a flight to Zurich, Switzerland in an attempt to flee the United States.   When he was unable to board that flight, he rented a car and drove towards Westchester, New York, where local law enforcement arrested him on January 11, 2021.

Following his arrest, Sabol was interviewed by FBI agents on multiple occasions.   During those interviews, Sabol told agents, among other things, that he believed that there was no question that the 2020 election was stolen; that he had seen video of ballots being mishandled and knew that Dominion voting machines had been tampered with; that he was very angry about election fraud, and that his state of mind on January 6, 2021 was that of "patriotic rage."   Sabol also told the agents that, on January 6, a "call to battle was announced," and he "answered the call because he was a patriot warrior."

## III.    THE CHARGES AND STIPULATED FACTS TRIAL

On November 17, 2021, a federal grand jury returned a third superseding indictment,

---

[15]  The FBI was able to obtain this video – Exhibit 9 – from that individual.

charging 24 counts against nine defendants. ECF 145.   Sabol was charged in 14 of the 24 counts:

- Count One: violation of 18 U.S.C. § 1512(c)(2) and (2) (Obstruction of an Official Proceeding and Aiding and Abetting)

- Count Two: violation of 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers or Employees) (MPD Officer M.T. at 2:04 p.m.)

- Count Three: violation of 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder) (2:04 p.m.);

- Count Four: violation of 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers or Employees) (charge at police line at 2:27 p.m.)

- Count Five: violation of 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder) (2:27 p.m.);

- Count Six: violation of 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder) (2:33 p.m.);

- Count Eight: violation of 18 U.S.C. § 2111 (Robbery in a Federal Enclave);

- Count Nine: violation of 18 U.S.C. § 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers or Employees and Inflicting Bodily Injury) (MPD Officer A.W. at 4:27 p.m. to 4:29 p.m.)

- Count Ten: violation of 18 U.S.C. § 111(a)(1) and (b), and 2 (Assaulting, Resisting, or Impeding Certain Officers or Employees with a Deadly/Dangerous Weapon and Aiding and Abetting) (MPD Officer B.M. at 4:27 p.m. to 4:29 p.m.)

- Count Fourteen: violation of 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder) (4:27 to 4:29 p.m.);

- Counts Eighteen, Nineteen, and Twenty: violations of 18 U.S.C. §§ 1752(a)(1), (2), and

(4) (Knowingly Entering or Remaining in any Restricted Building or Grounds, Disorderly and Disruptive Conduct in any Restricted Building or Grounds, and Engaging in Physical Violence in any Restricted Building or Grounds, all with a Deadly or Dangerous Weapon); and

- Count Twenty-Four: violation of 40 U.S.C. § 5104(e)(2)(F) (Violent Entry and Disorderly Conduct on Capitol Grounds).

On August 18, 2023, Sabol elected to proceed by stipulated trial on Counts One, Eight, and Ten of the Third Superseding Indictment, charging him with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2 (Count One); Robbery in a Federal Enclave, in violation of 18 U.S.C. § 2111 (Count Eight), and Assaulting, Resisting, or Impeding Certain Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Count Ten).   After the stipulated trial, the Court found Sabol guilty on all three counts.

## IV.    STATUTORY PENALTIES

Sabol now faces sentencing on those counts.   As to Counts One and Ten, Sabol faces up to twenty years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000 or twice the gross pecuniary gain or loss of the offense (whichever is greatest), and a mandatory special assessment of $100. On Count Eight, Sabol faces up to fifteen years of imprisonment, along with the other terms set out above.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.  The Government's and U.S. Probation Office's Guidelines Calculations

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

Case 1:21-cr-00035-RC   Document 449   Filed 03/14/24   Page 24 of 39


(2007).   The Government agrees with the calculation set forth in the PSR for Count Ten. However, the Government disagrees with the Probation Office's calculations for Count One and with the grouping analysis conducted by the Probation Office.   The Government submits that the guidelines should be calculated as follows:

Count One (§ 1512(c)(2)):

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | **14**[16] |
| U.S.S.G. § 3A1.2(c)(1) | Official Victim | **+6**[17] |
| U.S.S.G. § 3C1.1 | Obstruction | **+2** |
| | **Total Offense Level:** | **22** |

Count Eight (§ 2111):

| | | |
|---|---|---|
| U.S.S.G. § 2B3.1(a) | Base Offense Level | **20** |

---

[16] The PSR was issued after the D.C. Circuit's opinion in *United States v. Brock*, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024). In *Brock*, the D.C. Circuit held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id*. at *8.   But that decision does not undercut the severity of Sabol's crimes. If anything, assaulting officers and the Capitol in an attempt to stop Congress from certifying a presidential election is *far more serious* than interfering with a routine court proceeding. *See Brock*, 2024 WL 875795, at *15 ("[I]nterference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work[.]"). Precisely because *Brock* held that the Sentencing Guidelines do not account for this crucial factor, the Court is empowered to depart or vary, if necessary to reach an appropriate sentence.   *See, e.g.*, *United States v. Bender*, 21-cr-508-BAH, ECF 161 at 3 n.1 ("[*Brock*] does not influence the outcome in this case, since *the Court would have varied upwards by at least three offense levels to account for the significant disruption of a critical and important governmental function as a result of defendants' offense conduct if the specific offense characteristic at U.S.S.G. § 2J1.2(b)(2) did not apply.*") (emphasis added). The government submits that on the unique facts of this case, the advisory guideline range adequately reflects the seriousness of his offense.

[17] The PSR did not recommend this adjustment for Count One, but the government submits that it applies because (a) as discussed in footnote 16 below, Sabol's robbery of Officer A.W.'s baton likely caused or exacerbated the laceration to his head and certainly created a substantial risk of serious bodily injury and (b) Sabol's actions in dragging Officer B.M. out into the crowd of armed, violent rioters, at the point of a stolen baton, where he was beaten, in furtherance of Sabol's efforts to interfere with the certification, created a substantial risk that Officer B.M. would suffer serious bodily injury.   (Indeed, as this Court has noted previously, it is fortuitous that Officer B.M. was not more severely injured.)   The government notes that the PSR does recommend a 4-level adjustment based on serious bodily for Count Eight, Sabol's robbery of Officer A.W.'s baton.

| U.S.S.G. § 2B3.1(b)(3)(A) | Serious Bodily Injury | **+4[18]** |
| U.S.S.G. § 3A1.2(c)(1) | Official Victim | **+6** |
| U.S.S.G. § 3C1.1 | Obstruction | **+2** |
| | **Total Offense Level:** | **32** |

Count Ten (§ 111(b)):

| U.S.S.G. § 2A2.2(a)[19] | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous weapon | **+4** |
| U.S.S.G. § 2A2.2(b)(3)(B) | Bodily Injury | **+3** |
| U.S.S.G. § 2A2.2(b)(7) | 111(b) | **+2** |
| U.S.S.G. § 3A1.2(a)-(b) | Official Victim | **+6** |
| U.S.S.G. § 3C1.1 | Obstruction | **+2** |
| | **Total Offense Level:** | **31** |

Because "closely related counts" group under U.S.S.G. §3D1.2, Sabol's three counts of

conviction form two groups:

**Group One** – Counts One (Obstruction) and Eight (Robbery) group pursuant to U.S.S.G.

§ 3D1.2(c) because Count Eight embodies conduct that is treated as an adjustment to the guideline

---

[18] In *United States v. Justin Jersey*, 21 Cr. 35 (RC), the government advocated for, and the Court applied a 5-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(3)(B) due to Officer A.W.'s serious bodily injury, *i.e.*, the laceration to his head that required staples to close.   In contrast, in *United States v. Clayton Ray Mullins*, 21 Cr. 35 (RC) and *United States v. Ronald Colton McAbee*, 21 Cr. 35 (RC), the government advocated for, and the Court applied, a 3-level enhancement due to Officer A.W.'s bodily injury.   The reason for this distinction was that blood – likely from the laceration -- is visible on the collar of his jacket at the commencement of Mullins's and McAbee's assaults of Officer A.W., indicating that this particular injury had already been inflicted.   *See* Exhibit 13 at 00:38.   Sabol's robbery occurred prior to this, blood is not visible on his collar in the moments immediately prior to the robbery, *see* Exhibit 12 at 00:14-00:15, and the manner in which Sabol grabbed Officer A.W.'s baton and pulled it away from him caused Officer A.W.'s torso to move up and forward, then to fall back, consistent with the back of Officer A.W.'s head hitting the ground, *see* Exhibit 10 at 00:26-00:30; Exhibit 12 at 00:11-00:15.

[19] Section 2A2.2 applies here because Sabol's conduct involved aggravated assault. *See* U.S.S.G. § 2A2.4(c)(1). Aggravated assault "means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt. n.1. Here, Sabol's assault involved a dangerous weapon (baton) with intent to cause bodily injury, and it involved the intent to commit another felony, specifically, obstructing, impeding, and interfering with a law enforcement officer lawfully engaged in the performance of his official duties during a civil disorder, in violation of 18 U.S.C. § 231(a)(3).

applicable to Count One.   *See* U.S.S.G. § 3A1.2(c)(1).   The highest offense level for this group is **32.**

      **Group Two** – Count Ten (Assault of B.M.) does not group with the other counts, because it (a) involves a different victim (B.M.) and (b) is not treated as a specific offense characteristic and/or other adjustment to the guideline applicable to another count.   The offense level for Group Two is **31**.

      The offense levels for Group One is one level more serious than the offense level for Group Two.   Group One and Group Two therefore each count as one unit pursuant to U.S.S.G. § 3D1.4(a).   This results in an increase of two offense levels, resulting in a Combined Offense Level of **33**.   The application of a three-point reduction for acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a) and (b), results in an Offense Level of 30, with a corresponding Guidelines imprisonment range of 108-135 months.

      Probation calculated Sabol's criminal history as category I, which is not disputed.   *See* PSR ¶ 92.   Accordingly, the U.S. Probation Office calculated Sabol's total adjusted offense level, following a three-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b),[20] as **31**, and his corresponding Guidelines imprisonment range as 108-135 months.   *See* PSR ¶ 136.

      Recent amendments to the Sentencing Guidelines for 2023 include a new Guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in

---

[20] Sabol's conduct resulted in an enhancement under § 3C1.1, which ordinarily precludes an adjustment for acceptance of responsibility. *See* U.S.S.G. § 3E1.1, cmt. 4. Here, the government submits that because Sabol's obstructive conduct ceased after his arrest; this is the "extraordinary" case in which both adjustments are appropriate.

effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement. Section 4C1.1 does not apply in this case, as Sabol used violence in connection with this offense, in violation of 4C1.1(a)(3).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(D) of this memorandum, Sabol's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Sabol's assaultive conduct that day was prolonged and persistent.   He was at the front of rioters charging into the police line at the West Plaza. And once the police fell back to the Lower West Terrace, Sabol followed and continued to assault them at the Archway.   Sabol and his co-defendants started what became an extended, multi-assailant brawl, attacking police officers, which resulted in injuries to those officers.   Sabol was involved in assaulting officers for hours on January 6.

The nature and circumstances of Sabol's actions on January 6, 2021 were of the utmost seriousness and fully support the government's recommended sentence of 121 months' incarceration.

### B.  The History and Characteristics of the Defendant

Though Sabol has no criminal history points, this case is not Sabol's first involvement with the criminal justice system.   At age 28, Sabol received a deferred sentence for driving under the influence and possession of marijuana (PSR at ¶ 94).   And at 47, Sabol received a deferred

sentence for child abuse (PSR at ¶ 95).

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Sabol assaulted multiple officers in the midst of a riot and attack on the U.S. Capitol Building and grounds. His actions on January 6, 2021 were the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

**D. The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[21] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration.   Sabol's actions on January 6 were deliberate and dangerous, and as noted above, his criminal conduct on January 6, 2021 took place over the course of hours and consisted of multiple assaults against police officers.

---

[21] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Sabol has not fully reckoned with his conduct on January 6, 2021.   When interviewed by agents days after the riot, Sabol maintained his belief that the 2020 election was stolen; ballots had been mishandled; and this election fraud caused him such anger that he was in a "patriotic rage" by January 6, 2021.   Sabol has never expressed any remorse for his conduct. To the contrary, he knowingly benefits from a fundraising webpage which denies his responsibility, referring to his involvement in January 6 as merely "alleged" and putting the phrase "capitol riot" in quotes to suggest that what happened on January 6 was not, in fact a riot. The site quotes Sabol, not as accepting responsibility, but as standing in "defiance [of] deception and corruption."   Further, the site euphemistically refers to his crime as a "situation" and puts out a nonsensical request for "video of him helping officers," when he was actually attacking officers that day.   *See* Exhibit 15.

This fundraising page also links to a Tumblr page in which Sabol misleadingly claims that he was simply "stumbling backwards from the tunnel entrance" at 4:27 p.m., when he was actually recoiling from ripping the baton out of Officer A.W.'s hands.   Sabol also falsely claims that he and two other people "pick[ed] up an injured officer that is on the ground and carried him in the direction of the Washington monument to safety."   *See* Exhibit 16.

Unsurprisingly, Sabol's requests for video of these events have gone nowhere, because no such evidence exists.   As discussed above, the evidence shows Sabol attacked officers that day, and did nothing to help them.

Unlike many January 6 defendants who either turned themselves in or resolved their cases quickly after their arrest, Sabol waited over two and a half years to resolve his case, even though his crimes were well documented on video.   And it is worth noting that Sabol did not plead guilty to his crimes; although the parties reached a pre-trial resolution in this case, it was by stipulated trial where Sabol acknowledged his conduct, but not its criminal nature.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added).   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in

Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[22]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[23] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the following cases provide useful comparisons to the relevant sentencing considerations in this case.

---

[22] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[23] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Sabol's co-defendants are the most ready comparators, as they participated in the same series of events between 4:27 p.m. and 4:29 p.m. on the LWT:

*United States v. Justin Jersey*, 21-cr-35 (RC). Justin Jersey charged at and attacked the police line in the Archway. Jersey viciously assaulted Officer A.W. by grabbing his face and knocking him to the ground, leaving him vulnerable to attack by other rioters (like Sabol).   Jersey eventually obtained a police baton and used it to strike at the other officers in the line.   After retreating back into the crowd, Jersey remained in the area and collected the helmet of the officer he had brutally knocked down as a trophy.   Officer A.W. sustained serious injuries as a result of the attacks on the LWT, including from Jersey's assault.   Jersey's assault of Officer A.W. reignited other rioters' violent assaults against police.   For Jersey, the Court determined that the defendant's total offense level was 24 and criminal history category was I, resulting in a Guidelines range of 51 to 63 months' imprisonment. The Court imposed a Guidelines range sentence of 51 months' incarceration.

*United States v. Ronald Colton McAbee*, 21-cr-35 (RC).   After watching other rioters brutally assault officers, including knocking Officer A.W. to the ground and dragging Officer B.M. head first into the mob, McAbee maneuvered to the center of the action, grabbed Officer A.W.'s leg, and pulled him away from his fellow officers and towards the mob.   When other officers attempted to assist their fallen colleagues, McAbee interfered with their efforts, cursing at them and striking Officer C.M.   McAbee then returned to Officer A.W. and lifted his torso, and the two slid down a set of steps.   McAbee stayed on top of the officer, pinning him down as he struggled to free himself, for more than 25 seconds.   During that time, Officer A.W. was struck by other rioters; his mask was ripped off; and he was sprayed in the face with a substance similar to mace. The next day, McAbee posed for a photograph with a friend, smiling and holding a newspaper

with the headline "INSURRECTION."   For McAbee, the Court determined that the defendant's total offense level was 30 and criminal history category was I, resulting in a Guidelines range of 97-121 months' imprisonment. This Court imposed a below-guidelines sentence of 70 months' incarceration.

*United States v. Mason Courson*, 21-cr-35 (RC).   Courson joined the assault on Officer B.M., striking him with a police baton, then, as the officer attempted to stand up and rejoin the police line, pushing him towards the mob of rioters.   Courson then grabbed at Officer A.W. as he was still lying on the ground.   Approximately one hour earlier, Courson and other rioters forced their way through the line of police officers guarding the Tunnel.   As officers expelled rioters, Courson grabbed at their equipment.   For Courson, the Court calculated a total offense level of 26 and a criminal history category of II, resulting in a Guideline range of 78 to 87 months' imprisonment.   This Court imposed a below-guidelines sentence of 57 months' incarceration.

Sabol is differently situated from his co-defendants, however.   He engaged in violence with the intent of obstructing the certification of the electoral college vote count.   Unlike Jersey and Courson, Sabol engaged in more extensive preparation, traveling asa   member of a group, bringing supplies, and wearing a helmet.   While Jersey and McAbee's assaults were dangerous and incredibly serious, they occurred in a very compressed time period.   In contrast, Sabol raged amongst the crowd on the west side of the Capitol for nearly two and a half hours, constantly placing himself up against the police line, seeking to get closer to the action.

Sabol's obstructive intent makes his conduct more egregious than other defendants who were convicted only of violations of Section 111.   For example, Albuquerque Head and Kyle Young[24]  both participated in an assault of Officer M.F. in the Tunnel and on the LWT at 3:18 p.m.

---

[24] *United States v. Head and Young*, 21-cr-21 (ABJ).

Young entered the Tunnel at approximately 2:43 p.m., just after rioters first attempted to breach the Capitol at that location and participated in the rioters' efforts to force their way into the Tunnel. Young provided another rioter – Daniel Rodriguez, discussed below-- with a taser and showed him how to use it.   He also directed a strobe light at the police line, threw an audio speaker towards officers (striking another rioter), and jabbed a long stick towards the police line.

Head entered the Tunnel slightly later, at approximately 3:07 p.m., after pushing his way through the crowd on the LWT to get to the Archway.   Head put on a gas mask that a fellow rioter handed him and fought to get to the front of the mob until he was directly up against the police line, where he pushed a riot shield into the line for several minutes.   At approximately 3:18 p.m., Head grabbed Officer M.F. around the neck and pulled him off the police line, into the crowd of rioters in the Tunnel and on the LWT, yelling "Hey!  I got one!"  There, Officer M.F. was assaulted by multiple individuals, including Rodriguez, who tased the back of his neck, and Young, who restrained Officer M.F. by the wrist.   Young them moved towards another officer who had been pulled into the crowd, USCP Officer M.M., and assaulted him, grabbing at his helmet and body, pushing him, and hitting him, while Head continued to try to assault Officer M.F.   Young and Head each pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1).

The Court determined that Young's total offense level was 24 and criminal history category was IV, resulting in a Guidelines range of 77-96 months' imprisonment.   The Court imposed an 86-month prison sentence on Young.   The Court determined that Head's total offense level was 24 and criminal history category was VI, resulting in a Guidelines range of 96 months' imprisonment.[25]   The Court imposed a 90-month prison sentence on Head.

---

[25] Head's range of 100-125 months was capped by the 8-year statutory maximum sentence for a violation of 18 U.S.C. § 111(a).

Like Head and Young, Sabol dragged a police officer into the crowd on the LWT, where he was assaulted by other rioters.   Sabol also engaged in a series of other offenses on the West Plaza and violently disarmed Officer A.W., leaving him vulnerable to attack, all prior to his assault of Officer B.M.

Sabol's course of conduct is more akin to that of Daniel Rodriguez.[26]   Rodriguez, the administrator of a Telegram chat group titled PATRIOTS[45] MAGA Gang, spent weeks preparing to violently disrupt the Electoral College certification.   At the Capitol, he deployed a fire extinguisher towards the police line in the Tunnel, participated in a coordinated effort to break through that line, and shoved a wooden pole at officers.   Then, he brandished a taser, given to him by Kyle Young, at the officers.   At 3:15 p.m., Rodriguez participated in another effort to break through the police line, culminating in Officer M.F. being pulled off of the line by Albuquerque Head.   As Head pulled Officer M.F. down the LWT steps, Rodriguez pushed the taser into Officer M.F.'s neck.   Rodriguez also entered the Capitol building via a broken window on the north side of the Tunnel, tried to smash another window to make an entry point for other rioters, and entered several offices, where he rifled through bags and desks.   Later, Rodriguez instructed others to delete videos they had taken at the Capitol so that they could not be used as evidence.

Sabol's preparations for and incitement of violence on January 6 were not as extensive as Rodriguez's and Officer M.F.'s physical injuries were more severe than Officer A.W. or Officer B.M..   However, Sabol and Rodriguez engaged in similar levels and frequency of violence, each with the goal of halting the certification of the electoral college vote.   Further, Sabol and Rodriguez each engaged in obstructive conduct in the days that followed January 6, Rodriguez by instructing others to delete evidence, Sabol by himself destroying evidence and attempting to flee.

---

[26] *United States v. Rodriguez*, 21-cr-246 (ABJ).

For Rodriguez, the Court calculated a total offense level of 30 and criminal history category of I, resulting in a Guidelines range of 97-121 months' imprisonment.   In imposing sentence, the Court varied upwards, determining that a 151 month sentence was warranted.

## VII.   RESTITUTION

The Court should (A) order Sabol to pay $2,000 in restitution to the Architect of the Capitol and (B) find Sabol jointly and severally liable for $30,165.65 to MPD, based on the costs of Officer A.W.'s medical treatment and time off work due to his injuries that MPD incurred on his behalf.

### A.  The Court Should Order Sabol to Pay Restitution to the Architect of the Capitol.

The Court should order Sabol to pay $2,000 to the Architect of the Capitol.   The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction,"   *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."   *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Under 18 U.S.C. § 3663(a)(3), Sabol should pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role he played in the riot on January 6.[27]   The riot at the

---

[27] The government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies in July 2023.[28] *Id.*   This restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.   *See* PSR ¶ 158.

**B.  The Court Should Order Sabol to Pay Restitution to MPD.**

In addition, under 18 U.S.C. §§ 3663(b)(2) and 3663A(b)(2), Sabol should also be ordered to pay restitution to "all victims who suffered bodily injury as a result of [his] conduct," including Officer A.W., in an amount to be determined by the Court.   As reflected in Exhibit 17, the MPD incurred a total of $30,165.65 on Officer A.W.'s behalf[29] that is attributable, at least in part, to Sabol's criminal conduct and his offense of conviction—pulling Officer A.W.'s baton out of his hands, leaving him lying on the ground defenseless, as other rioters pulled him down the stairs, struck his body, pulled off his gas mask and maced him. █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██

Officer A.W. may have sustained some of his injuries before Sabol stole his baton.

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[28] This figure does not include damages incurred by MPD, including the expenses referenced in Section VII.B below.

[29] Under 18 U.S.C. § 3664(j)(i), "[i]f a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation."

██████████████████████████████████████████████

███████████████████████████      As discussed above, Officer A.W. did not return to work until May 2021 because, as he described it, he "was in no shape to do [his] job" "[p]hysically [or] mentally" after being assaulted on January 6, 2021.  *United States v. McAbee*, 21 Cr. 35 (RC), Trial Tr., Oct. 4, 2023 at 195.   While Officer A.W.'s physical symptoms were largely resolved by February 2021, his mental and emotional symptoms clearly required care for several more months. This defendant – who was one of the individuals responsible for placing Officer A.W. in this traumatic and violent situation – should be held responsible for his share of the damages caused.

Three of Sabol's co-defendants – Justin Jersey, Clayton Mullins and Ronald Colton McAbee – have been convicted of assaulting Officer A.W.   The Court should impose liability jointly and severally to all four.  *See* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."); *United States v. Monzel*, 641 F.3d 528, 538–39 (D.C. Cir. 2011) ("Joint and several liability may also be appropriate under § 3664(h) where there is more than one defendant and each has contributed to the victim's injury.")

## VII.   FINE

Sabol's convictions under Sections 1512, 2111, and 111 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. §5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime

that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case.   As noted above and in the PSR, Sabol has raised money in an online campaign through GiveSendGo, a fundraising website. PSR ¶ 128.   As of March 13, 2024, Sabol had raised $19,458 through the website. *Id.*; Exhibit 14.   As discussed above, this website contains numerous statements minimizing the events of January 6, 2021 and Sabol's role in them.   It also refers to Sabol as a "true patriot."   Sabol should not be able to "capitalize" on his participation in January 6 riot in this way.

## VIII        CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of a term of incarceration of 121 months, three years of supervised release, $32,165.65 in restitution, and the mandatory $300 special assessment for the counts of conviction

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

*s/ Benet J. Kearney/Alexandra F. Foster*
Benet J. Kearney/Alexandra F. Foster
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
Alexandra. Foster@usdoj.gov / (619) 546-6735
Benet.Kearney@usdoj.gov / (212) 637 2260