1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

2

_____

3    United States of America,      ) Criminal Action
                                    ) No. 1:21-cr-00035-RC-1
4                   Plaintiff,      )
                                    ) **Sentencing**
5    vs.                            )
                                    )
6    Jeffrey P. Sabol,              ) Washington, D.C.
                                    ) **March 21, 2024**
7                   Defendant.      ) Time:  10:00 a.m.
     _____

8

**Transcript of <u>Sentencing</u>**

9

**Held Before
The Honorable Rudolph Contreras**

10

**United States District Judge**

11

<u>A P P E A R A N C E S</u>

12

For the Government:      **Benet Kearney**

13                        UNITED STATES DEPARTMENT OF JUSTICE
                          One Saint Andrew's Plaza

14                        New York, New York 10007

15   For the Defendant:      **Alex Cirocco**
                          LAW OFFICES OF ALEX CIROCCO

16                        600 Getty Avenue, Suite 305
                          Clifton, New Jersey 07011

17

Also Present:      Crystal Lustig, U.S. Probation

18   _____

19   Stenographic Official Court Reporter:
                          Nancy J. Meyer

20                        Registered Diplomate Reporter
                          Certified Realtime Reporter

21                        333 Constitution Avenue, Northwest
                          Washington, D.C. 20001

22                        202-354-3118

23   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.

24

25

<u>P R O C E E D I N G S</u>

THE COURTROOM DEPUTY:  This is Criminal Action 21-35, United States v. Jeffrey Sabol.

Counsel, please step forward to the podium and state your appearances for the record.

MS. KEARNEY:  Good morning, Your Honor.  Benet Kearney for the United States, and I'm joined at counsel table by FBI Special Agent Michael Deutsch.

THE COURT:  Good morning.

MR. CIROCCO:  Good morning, Your Honor.  Alex Cirocco representing the defendant, present in court to my right in the custody of U.S. Marshals.

THE COURT:  Good morning.

All right.  Mr. Sabol and defense counsel, have you reviewed the presentence report as revised following the defense and the government's submissions?

MR. CIROCCO:  Yes, Your Honor.

THE COURT:  Any additional objections?

MR. CIROCCO:  Judge, the objection that we raised in our sentencing memo regarding the enhancement of the dangerous weapon on Count 9.

THE COURT:  Okay.  I'll deal with that shortly.

All right.  Any additional objections from the government?

MS. KEARNEY:  Nothing other than the analysis of the

1   guidelines in our memo.

2          THE COURT:   Okay.   So under Federal Rule of Criminal

3   Procedure 32(i)(3)(A), the Court will accept the presentence

4   report as its findings of fact on issues not in dispute.

5          This case falls within the Sentencing Reform Act of 1984

6   under which Congress created the United States Sentencing

7   Commission which has issued detailed guidelines for judges such

8   as myself to consider in determining the sentence in a criminal

9   case like this.   The commission has set sentencing ranges for

10  specific offenses, and those ranges are contained in a

11  *Guidelines Manual*.

12         However, in light of the Supreme Court's decision in

13  *Booker*, the guidelines are not mandatory.   They're advisory but

14  must be consulted by the Court in determining the appropriate

15  sentence in a case.   Therefore, I will assess and determine the

16  proper sentence in this case by reference to and in

17  consideration of the guidelines in the first instance, but the

18  guidelines will be treated as advisory, not mandatory, and

19  there is no presumption that the guideline sentence is the

20  correct sentence.   The guidelines will be considered, along

21  with all the other relevant factors pursuant to

22  18 U.S.C. 3553(a).

23         Defendant was found guilty after a stipulated trial on

24  three counts of the superseding indictment:   Count 1,

25  obstruction of an official proceeding and aiding and abetting

1    in violation of 18 U.S.C. § 1512(c)(2) and 2; Count 8, robbery

2    within the special maritime and territorial jurisdiction of the

3    United States in violation of 18 U.S.C. § 2111; and Count 10,

4    assaulting, resisting, or impeding certain officers using a

5    dangerous weapon and aiding and abetting in violation of

6    18 U.S.C. § 111(a)(1) and (b)(2) -- 111(a)(1) and (b) and 2.

7         So there's a few guidelines disputes.  The defendant

8    disagrees with the probation addition of a 4-level increase to

9    the calculation of Count 10 for the use of a dangerous weapon,

10   which is the baton he wrestled from Officer A.W.  Defendant

11   argues he did not use the baton in any manner more than

12   possessing it.

13        Because the guidelines calculations are so much higher

14   than any sentence I intend to impose, I won't dwell on this

15   point very much, but I conclude that the defendant, at the very

16   least, brandished the baton.  Brandished, with reference to a

17   dangerous weapon, means all or part of the weapon was

18   displayed, which in this case is not disputed, in order to

19   intimidate that person.

20        Defendant was holding the baton fully visible, holding

21   it by the handle, ready for use as a weapon during a frenzy of

22   assaults in the middle of a pitched riot.  That in itself would

23   have intimidated all of those around him, including B.M.  Thus,

24   at a minimum, 3 levels are added to Count 10.

25        Finally, although the government disagrees with

1    probation's grouping analysis, the Court will rely on

2    probation's analysis because in the end, the Court's

3    bottom-line sentence will depend primarily on the comparator

4    sentences rather than the very high guidelines ranges.

5    Moreover, according to the manner that the guidelines are

6    calculated by probation, because Count 1, 18 U.S.C. 1512's

7    charge, is irrelevant to the guidelines number under the

8    probation calculation, whatever the Supreme Court does in

9    *Fischer* will be irrelevant to the sentence I impose.  Thus,

10   removing one potentially appealable issue.

11         So based on that, using the 2023 *Guidelines Manual*, the

12   first count, which is the 1512 count, there's the base level of

13   14, an added 2 for obstruction of justice, which is the deleted

14   evidence:  microwaved laptop and hard drive, disposal of the

15   phone; booked flight abroad and attempted flight, which results

16   in an adjusted offense level of 16.

17         Count 8, which is the robbery count, has a base level of

18   20.  There's a plus 4-level enhancement for -- because the

19   victim sustained bodily injury.  That was A.W.'s head

20   laceration, et cetera.  And a victim-related adjustment of

21   plus 6, which is in a manner creating substantial risk of

22   serious bodily injury of a law enforcement officer assaulted

23   during the course of such offense, And then the 2-level

24   increase also for adjustment of obstruction of justice.  That

25   count results in an adjusted offense level of 32.

1        With respect to Count 10, which is the 111(a) and (b)

2   conviction, it's a base level of 14; special offense

3   characteristic plus 3 because a dangerous weapon was

4   brandished, the baton; special offense characteristic of plus 3

5   because the victim sustained bodily injury.  That was B.M.'s

6   bruising and abrasions.  A special offense characteristic of

7   plus 2 because there was a conviction under 111(b), and

8   victim-related adjustment of plus 6 because the victim was a

9   government officer; the offense was motivated by such status.

10  And then an enhancement of plus 2 for the obstruction of

11  justice, which applies to the other two counts as well.  For

12  that count, the adjustment offense level is 30.

13       One unit is assigned to the group with the highest

14  offense level, which is the robbery count here, which is 32.

15  One additional unit is added to the assault, the 111 charge,

16  which is at 30.  And no points are added for the 1512 charge,

17  which is at 16, more than 9 levels lower than the highest one.

18  So that results in total units of 3.

19       Added to the highest count, which is 32, that results in

20  34.  And the 3 points' adjustment for acceptance of

21  responsibility; a 2-level decrease for clear demonstration of

22  acceptance of responsibility, and an additional 1-level

23  decrease for assistance in investigation by timely provision of

24  information concerning the defense -- defendant's involvement

25  and timely notification of intent to enter a guilty plea.

1        That results in a total offense level of 31.

2        Defendant's criminal history has a couple of dated -- or

3   somewhat dated convictions:  a 1998 DWI and a 2017 child abuse

4   conviction.  None of these merit points.  So he ends up with a

5   criminal history category of I.

6        And so the guidelines range for imprisonment based on a

7   total offense level of 31 and a criminal history category of I

8   is 108 to 135 months.

9        As I said, under the law following *Booker*, the

10  guidelines are advisory in this case but will be considered

11  fully by the Court in determining the proper sentence, along

12  with all the other relevant factors under 3553(a).

13       Ms. Kearney, would the government like to address the

14  Court regarding sentencing?

15          MS. KEARNEY:  Yes, Your Honor.  Thank you.

16       Your Honor, this Court has now sentenced seven

17  co-defendants.

18          THE COURT:  I thought we were going to be done this

19  week, but.

20          MS. KEARNEY:  I thought we were too, Your Honor.  And

21  I had prepared the remarks thinking of this one as the final

22  one, but I don't think it actually changes the tenor of my

23  argument.

24       You presided over not only a trial of -- regarding the

25  series of assaults, but many other January 6th cases, including

1    in the tunnel on the lower west terrace area.

2              THE COURT:  Thank you, Judge Sullivan.

3              MS. KEARNEY:  Yes.

4         And so I don't -- I don't need to remind the Court of

5    the significance of the events of January 6th, of the brutality

6    of the viciousness of the violence that occurred specifically

7    in that tunnel area, and I certainly don't need to talk about

8    exactly what happened in those key 90 seconds.

9         And so I want to start where the defendant started,

10   which is his first point in his letter to the Court, which is

11   "I take full responsibility for my actions."  And then he goes

12   on to demonstrate precisely how that could not be farther from

13   the truth.

14        And I raise this, Your Honor, because I think it goes to

15   specific deterrence in this case, and I think it highlights the

16   particular aggravators that apply to this defendant, which set

17   him apart from his co-defendants and from many other

18   January 6th defendants, certainly not all.

19        And so this defendant, like others who have come before

20   Your Honor, has clearly not reckoned with what it is that he

21   did.  He assaulted multiple police officers with the goal of

22   interfering with the Electoral College certification.  And he's

23   not the first defendant to come before you claiming that he was

24   only trying to help, that he was only concerned with

25   Rosanne Boyland, and that he was actually trying to assist the

1    police.

2         Your Honor, it is a wonder that all of the rioters who

3    claim that they were trying to protect the police were not able

4    to stop each other from assaulting them.  But Mr. Sabol's

5    version of events has admitted every single fact that

6    undermines the self-serving narrative.  It makes no mention of

7    the fact when he wrested Officer A.W.'s baton from the

8    officer's grasp, A.W. was clearly a police officer.  He's

9    wearing a neon-yellow jacket and he is lying defenseless on his

10   back.

11        It doesn't acknowledge that when this defendant dragged

12   Officer B.M.'s body down the steps, he too was clearly a police

13   officer.  Mr. Sabol claims he didn't notice the large letters

14   on that officer's back that said police; that he didn't realize

15   that this person dressed like a police officer who had fallen

16   from the police line was a police officer; and that there's

17   another officer reaching for him, trying to pull him back into

18   the crowd.

19        There were plenty of people on the ground in the

20   archway.  Mr. Sabol helps none of them.  And like Mr. McAbee

21   and like Mr. Mullins, he was focused on the officers.  This was

22   not a man trying to help.  This was not a man trying to calm

23   the crowd.

24        Conveniently, Mr. Sabol also doesn't mention his conduct

25   on the west plaza, which I submit, Your Honor, also sets him

1   apart from his co-defendants.  Two hours before the 4:27

2   assaults, Mr. Sabol rammed into police lines.  He tried to take

3   officers' weapons and their protective equipment.  And all of

4   that makes clear what his intent was two hours later.  He

5   doesn't address any of that, and that's because they don't fit

6   the story he is telling himself.

7        He doesn't mention the protective gear he wore.  He

8   doesn't mention the pain and trauma that he caused to the

9   officers who were assaulted.  He doesn't acknowledge the fear

10  of those who were trapped inside the Capitol Building or how

11  his own actions undermine the foundations of our democracy.

12       Instead, he spends more time and space attempting to

13  vindicate claims regarding election fraud, his motivation for

14  being at the Capitol that day, and claims that he was set up.

15  He talks of federal agents being in the crowd.  He's entitled

16  to believe what he wants, Your Honor, but that is not a

17  justification for assault, and it is not a justification for

18  storming the Capitol Building.

19       And his adherence to those beliefs and his repetition of

20  them, his -- the fact that he is convinced that he will be

21  proven right is concerning in the context of deterrence and

22  particularly in the current climate, Your Honor, where tensions

23  are still high, where things are very volatile.  Mr. Sabol's

24  prioritization of these theories and his unwillingness and his

25  inability to come to terms with his conduct about why what he

1   did that day was not only illegal, but wrong, even 3 years

2   later, highlights the need for deterrence in this case.

3         Mr. Sabol's intentions in arriving at the Capitol,

4   Your Honor, to fight tyranny, to put a stop to the

5   certification also distinguish him from a co-defendant like

6   Mason Courson or Peter Stager who -- you know, many -- many

7   January 6th defendants, Your Honor, claim that they were caught

8   up in the moment, that they were carried away with the crowd,

9   that their emotions got the best of them.

10        Mr. Sabol came much more prepared than that.  And while

11  he attempts to say that he should not have followed, that he

12  was swept along, he -- he arrived with a much better idea of

13  what he was getting into.

14        And for those reasons, Your Honor, the government

15  submits that a sentence of 121 months is appropriate in this

16  case.

17             THE COURT:  All right.  Does the government -- the

18  PSR didn't have very much information on the child abuse

19  charge.  Do you have any more information?

20             MS. KEARNEY:  We don't.

21             THE COURT:  Okay.  All right.  And there's no

22  additional statements from B.M. or A.W. for this case?

23             MS. KEARNEY:  No.  I think Officer A.W. would like to

24  rest on the statement he made in connection with Mr. Jersey and

25  his testimony at Mr. McAbee's trial.

```
1              THE COURT:  All right.  Thank you.

2              MS. KEARNEY:  Thank you.

3              THE COURT:  Mr. Cirocco.

4              MR. CIROCCO:  Thank you, Judge.

5         Your Honor, I know Ms. Kearney said this was her seventh

6    sentence before Your Honor.  It is my first.  So please excuse

7    any nerves.

8              THE COURT:  No problem.

9         I'll ask the same question as I did the government.

10   With respect to the child abuse, a good part of your

11   presentation has to do with the defendant not being a violent

12   person.  I'm assuming that charge involved violence.

13             MR. CIROCCO:  Judge, the allegation may have --

14             THE COURT:  Oh.  It was a conviction.

15             MR. CIROCCO:  Right.  It did end up being dismissed,

16   though, through a deferred disposition, Judge.

17             THE COURT:  Do you know if -- the allegation was that

18   it involved violence?

19             MR. CIROCCO:  Judge, if I can just have one second.

20             (REPORTER'S NOTE:  A sotto voce conference was held

21   between Mr. Cirocco and the defendant.)

22             MR. CIROCCO:  Judge, the issue was there was a

23   physical action between my client and his son, but the sheriff

24   and the school nurse found there was no injuries on -- on him.

25             THE COURT:  Okay.
```

1          MR. CIROCCO:  Good morning, Your Honor.  In addition

2     to my oral argument, I do incorporate my sentencing memo that I

3     did submit and all the exhibits.

4          Judge, we're not here today because Jeffrey Sabol simply

5     came to the Capitol on January 6th.  We're not here because

6     when he was here at some points he expressed his

7     First Amendment to free speech or the right to assemble.  And,

8     Your Honor, as he may say himself, he is not sorry for simply

9     coming to the Capitol or expressing his rights to free speech

10    or to assemble.

11         But why we are here and what my client is sorry for and

12    is contrite for and does take full responsibility for is his

13    engagement with law enforcement officers and putting his hands

14    on police officers.  And not just because there's a statute

15    that says it's wrong, not because he was arrested, charged, and

16    convicted, but because in his heart and his moral compass, he

17    knows what he did was wrong.

18         Judge, I was retained by Jeffrey Sabol on June 21st,

19    2021, 33 months to the day.  Now, today our attorney-client

20    relationship will end, but I can say to this Court -- and I can

21    say to this Court proudly -- that that attorney-client

22    relationship has developed into a friendship.

23         Throughout the past 33 months, Your Honor, I don't think

24    more than three or four days have gone by that I haven't spoken

25    with Jeff, either via tablet communication, via phone call, via

1    videoconference or in person.  And the reason that

2    attorney-client relationship developed into a friendship was

3    because we didn't just talk about his case.  We talked about

4    his case a lot.  Don't get me wrong.  A lot, a lot, a lot.  But

5    we talked about other things.

6         We talked about family.  We talked about business.  We

7    talked about life.  Jeff on multiple occasions has asked me to

8    call his parents, just to check in on them and see how they're

9    doing.  Jeff has asked me to call his mother, to send flowers

10   to his fiancée, Michelle, for her birthday.

11        When I told him a few weeks ago I was going on a ski

12   trip to Utah, he told me that when the time was right and he

13   was eventually released, he would join me and teach me.

14        As I brought up a little bit in my memo, Judge, about

15   his employment, he did have a company called Revolver Gear that

16   was very close to launch prior to January 6th, 2021, but that's

17   something we spoke about as well, the business, the product

18   itself.

19        I got married on September 8th, 2023.  About two weeks

20   after that, I received a congratulations card in the mail from

21   Jeff and his fiancée, Michelle.  That's the type of human that

22   Jeffrey Sabol is.

23        Now, Judge, I'm hired to say all these things about him,

24   and I believe them.  But the people that sent all those

25   character letters in, which I know the Court reviewed, which I

1    know the government has, were not hired.  And I'm not going to

2    go through every single character letter, Judge.  But in

3    reviewing them, in every single letter, one of the following

4    characteristics is included in there:  caring, selfless,

5    putting others in front of himself, doing volunteer work,

6    getting his children involved in volunteer work, a family man,

7    nonviolent.  And I would say that the most common statement in

8    those letters, Your Honor, is that the events of January 6th,

9    2021, were an aberration of his character.

10          Your Honor, Jeffrey Sabol's 54 years old and was born in

11   Utica, New York.  He received a bachelor of science from the

12   State University of New York College.  And in 1992 he moved

13   from New York to the state of Colorado for two simple reasons:

14   He loved to ski and because of the song by John Denver "Rocky

15   Mountain High."

16          He has been a productive member of society since he

17   graduated college, fully employed since 1992, most recently as

18   a senior geophysical manager at Kemron, and he also has

19   volunteered at a Westernaires nonprofit in Golden, Colorado,

20   which is a kids' equine program.

21          He is divorced from his ex-wife who he shares three

22   children with:  twins Wyatt and Sophie, who are 22, and a

23   daughter Sasha, who is 18.  I think the -- Exhibit B, Judge,

24   which I submitted to the Court, that through his incarceration

25   for the past 38 months, he has still fulfilled his

1    court-ordered obligation of child support to his youngest

2    daughter Sasha, which I think speaks volumes about the type of

3    man he is, the type of human he is, and backs up the things I

4    previously said about him.

5         He has a loving family, Judge.  His mother, Vicki, is

6    81 years old and suffers from COPD.  His father, Andrew, is 85,

7    recently underwent heart surgery.  And his fiancée, Michelle,

8    is 56 who has two sons, ages 33 and 30.  His three children,

9    his mother, his father, and fiancée are the six most important

10   people in his life, Judge.

11        And I want to point out that specifically his mother,

12   father, and fiancée, Michelle, they're not here today.  And

13   that is in no way reflective of their lack of love or support

14   for Jeff.  He asked them and had me tell them not to come for

15   the simple reason of their health issues and what it would take

16   to get down here and for the fact they wouldn't be able to do

17   anything with him today anyway, not talk to him, not touch him,

18   not hug him, not kiss him.  His plan is that if he is sentenced

19   to more time, Judge, and he is at a facility close, that they

20   could come and see him and have a real substantive interaction

21   with him.

22        Judge, to put it simply, the character letters, the

23   photos, my advocacy for him, shows what type of person

24   Jeff Sabol is throughout his life and that his actions on

25   January 6th were an aberration of his character.

1        As Your Honor stated, the sentence -- Your Honor's

2    sentence has to follow 18 U.S.C. 3553, a sentence sufficient

3    but not greater than necessary to comply with four factors:

4    punishment, deterrence, protection of the public, and

5    rehabilitation.  As Your Honor stated, he has zero criminal

6    history points, a DUI from over 25 years ago, and a misdemeanor

7    involving his son that was eventually dismissed in 2018.

8        I submit that he does not have a violent past.  He is

9    not part of any extremist groups, Your Honor.  He has a strong

10   work history, strong employment history.  All of his character

11   letters talk about how great his character is as well.  And I

12   submit that he is zero risk to the public and at a -- that more

13   prison time, other than the 38 months that he's already done,

14   is not necessary for the protection of the public.

15       Next is rehabilitation, Judge.  I submitted a letter

16   from an employer in the town of Waterville, New York, where his

17   parents and fiancée live right next to each; that immediately

18   upon being released, he has a job waiting for him, a job that

19   my client intends to take, Judge.  My client intends on getting

20   right back on his feet.

21       He plans on getting his Revolver Gear just -- back into

22   the market -- into the market, Judge.  Just briefly, it's a

23   product that assists while you're snowboarding.  He has patents

24   for that product, Judge.  I've assisted him while he's in

25   prison with sending certain documents to certain people --

1    powers of attorney -- certain things, Judge, so he continues to

2    work.

3              He has no drug or alcohol use, Judge.

4              As I will touch on momentarily, he did have a suicide

5    attempt on January 10th or 11th, but that was strictly related

6    to his actions on January 6th, and he has no mental health

7    issues in his past.  So I submit that there is no more prison

8    time necessary than the 38 months he has already served in

9    regards to rehabilitation.

10             Next would be deterrence, Judge.  In no particular

11   order, Jeffrey Sabol has lost his home, his car, his job, all

12   his money, his freedom, friendships, relationships, and his

13   ability to provide for himself and his family and many, many

14   other things.

15             But what he didn't lose because of that was his life.

16   As the Court's well aware, on January 10th or 11th, Jeff did

17   try to kill himself by slitting his wrists and his leg.  So I

18   want to touch on that very briefly, Judge.  The government in

19   their memo does say that he didn't show remorse for his

20   actions, and I would submit that they talk about that today too

21   based on his statement.

22             Judge, you can say a lot about when someone tries to

23   kill themselves.  The facts of why they did it are always very

24   important.  Obviously, every case would be fact specific.  The

25   term being a coward can be thrown around.  Not wanting to face

1    the music, trying to cop out early can always be thrown around.

2    But I think in every case, specifically this case, the act of

3    trying to take one's own life is the ultimate act of remorse,

4    that what he did that day was wrong.  And luckily for him,

5    luckily for his family -- his fiancée, his parents, his

6    children -- that did not happen that day.

7         So, Your Honor, for those reasons, I submit that

8    38 months that he served in prison are enough as far as

9    deterrence.

10        And also, just briefly, I want to touch on it, Judge, in

11   case Your Honor was going to rely on it.  The government did

12   mention that he took over two and a half years to resolve this

13   case.  As Your Honor is well aware, this was the biggest

14   investigation in the United States' history.  I think I still

15   received discovery about two months ago from the government.

16        We never objected to tolling the clock.  We never were

17   trying to force a trial.  My client wanted to do his due

18   diligence.  It was a process of getting discovery to the jail.

19   So I would ask that the Court not find that the time it took

20   for him to resolve his case, which the government also agreed

21   upon that he should receive a 3-point reduction for acceptance

22   of responsibility, is not used against him.

23        And the last factor, Judge, is a just punishment.  I

24   agree with the government that this was a serious offense.  I

25   agree that there needs to be a stern punishment for what he

1   did.  I ask this Court to sentence Jeff to 42 months in prison.

2   The government asked for 121 months, Judge, over 10 years.

3           Judge, the government compared his actions to an

4   individual named Daniel Rodriguez whose guidelines were

5   similar, which I think is a little bizarre based on his

6   actions.  And I'm not going to get into too much of what he

7   did.  But there was actions of using a fire extinguisher

8   against cops, using a TASER against cops, breaking a Capitol

9   window, going into the Capitol.  I think his actions are in a

10  different stratosphere compared to what Jeff did.  And that

11  isn't to minimize his actions.  His actions were bad, Judge.

12  But to compare them, I just don't think, is -- is just in any

13  way, Judge.

14          I do submit that a 42-month sentence would be just based

15  on -- and I'm focusing on the co-defendants that Your Honor has

16  already sentenced.  I submit that Defendant Stager,

17  Defendant Jersey, and Defendant Courson specifically used

18  weapons to attack police officers.  I don't think Jeff's

19  actions that day rose to that level of a sentence in the

20  50-month range.  I do submit to this Court that his actions

21  were more egregious than his Co-Defendants Barnhart and

22  Mullins, who received sentences in the -- in the 30-month

23  range, Your Honor.

24          He's lost a lot, at no one else's fault but his own, but

25  he's ready to move on.  He's ready to be a productive member of

1   society.  A 42-month sentence would him have fully released

2   from custody in about June.

3          As I stated, he plans on working, getting back on his

4   feet.  In his fiancée's character letter, she's been working

5   three jobs to try to support the family.  She stood by him

6   since day one, Judge.  He wants to lessen that burden.

7          I think the risk of reoffense is zero, to be completely

8   honest with the Court.  I know anything -- nothing is a

9   guarantee in life, but based on his history and based on the

10  character letters submitted, I think that 42 months is a just

11  punishment and -- and would serve all the factors that the

12  Court must consider when sentencing a defendant.

13         And with that I rest.  Thank you, Your Honor.

14         THE COURT:  All right.  I have a few specific

15  questions for you.  The circuit has changed the law here as

16  to -- what used to be the standard provisions of supervision

17  now have to be discussed at the sentencing.  So those -- what

18  used to be standard provisions were set forth in the PSR and in

19  paragraph 149.  I don't know if you had a chance to look at

20  those, but they're pretty much standard provisions.

21         MR. CIROCCO:  Yes, Judge.

22         THE COURT:  Do you have any objections to any of

23  them?

24         MR. CIROCCO:  No objection, Your Honor.

25         The only thing -- and I forgot to add, Judge -- and if

1  it's not appropriate at this time, I apologize.  But my client

2  did request when he is sentenced, if he is sentenced further,

3  that he be placed at Fort Dix prison.  That's close for his

4  family to come to.  So he would ask for that, if possible.

5          THE COURT:  All right.  I'll make that

6  recommendation.

7          All right.  The other question is you didn't have a lot,

8  if anything, about restitution in your memo.  The government

9  has asked for the -- what has become the standard 2,000 for the

10 Architect of the Capitol but also for 30,000 and change joint

11 and several with Jersey, Mullins, and McAbee for the medical

12 treatment and other things concerning A.W.

13         Do you have a position on either of those two forms of

14 restitution?

15         MR. CIROCCO:  Judge, I have no objection to the

16 $2,000.  And as far as the amount to the officers, I'm going to

17 just leave all my arguments to Jeff's actions that day and his

18 custodial sentence; so I would leave it to the Court.

19         THE COURT:  All right.  Thank you.

20         Mr. Sabol, do you wish to address the Court?

21         THE DEFENDANT:  If it's okay.

22         THE COURT:  Of course.

23         THE DEFENDANT:  Your Honor, I'd like to talk about

24 the child abuse.  That had to do with grades, be honest with

25 you.  I was -- I was working with my son very diligently to get

1    his grades up.  He had started smoking a lot of weed, and I was

2    working with him daily.  And, basically, I had to go away for a

3    project for a couple weeks.

4         And by the time I came back, I checked his grades

5    online, and he had gone from four Bs that we had worked very

6    diligently for down to four Fs and a D.  And I looked at him.

7    I think he was stoned at the time.  And I said,

8    "What happened?"  And he looked at me and he got a -- if I can

9    say smart ass -- but with a smart-ass grin and he said, "Oh.

10   I'm just lazy."  I -- I -- I got angry, and I grabbed him by

11   the scruff of his neck.  I did not hit him.

12        And then he ended up slipping on some orange juice

13   because I smacked it out of his hand.  There's no injury to

14   him.  The -- like Mr. Cirocco said, the sheriff and the school

15   nurse looked him over because he was talking to his mother.

16   His mother and I don't get along.  And she has -- she had tried

17   a number of times to try and get custody of my other two kids.

18   So this was a money ploy.

19        She took him to the sheriff that was working with the

20   school, and they ended up drumming it up -- or she ended up

21   drumming it up.  And then it came to where they talked with

22   me.  I explained everything to them.  But they went ahead and

23   charged me with a misdemeanor child abuse that I was going to

24   fight.  However, I would not put my daughters and my son on the

25   stand.  So I decided to take the hit.  And I went through

```
1    6 months of probation, and it went -- I guess a deferred

2    sentence is the term.  I'm not really familiar with it.  But

3    that's -- that's -- that's what happened there.

4         As far as January 6th goes, there was never intent.

5    There was never any intent of anything other than going there

6    and watching Mr. Trump speak.  And afterwards I walked down

7    with this -- not even a friend.  He was a friend of a friend's.

8    And then everything turned to absolute chaos.

9         I'm not here to get into all of the things that

10   happened.  It's not for this.  I'm -- I'm -- I'm -- I'm guilty.

11   I know that, a hundred percent.  I'm sorry that it happened.

12   There's -- there's nothing I can do to take that back.  I

13   can't.  So I -- I take full responsibility.  I do.

14        I engaged with the officers.  That was wrong, and I know

15   that's wrong.  I have -- I have a friend of mine that I do

16   activities with who's an officer in Denver.  So I have nothing

17   ever against -- against police.  It -- it was an absolutely

18   100 percent disgustedly horrible day.  And I'm sorry for it.

19   And I'm not making that up.  I'm not making light of it.

20        But there are many, many, many things that may have

21   contributed to that entire day.  I had no idea how that all

22   happened.  I don't.  I'm not -- I'm not making light of any of

23   this.  This is extremely serious.  People died that day.

24        For -- for -- if the officers were here, I would

25   apologize to them.  That's -- that's all I can say.  And -- and
```

1    I accept whatever it is that you -- you hand me.  And -- and

2    I'll be honest with you, I deserve it.  If I can go back, I

3    would, but I can't.

4         Thank you.

5         THE COURT:  All right.  Thank you.

6         We'll start with some of the financial issues.  With

7    respect to restitution, I do intend to impose the restitution,

8    the $2,000, paid to the Court -- Clerk of the Court to be

9    forwarded to the Architect of the Capitol for the damage that

10   was done that day; and the restitution to the Metropolitan

11   Police Department to reimburse them for the treatment that they

12   paid for and the time off of Officer A.W., which is the amount

13   of $30,165.65.  And that will be joint and several with the

14   co-defendants Jersey, Mullins, and McAbee.

15        So with respect to the fine, the maximum fine is

16   $250,000.  The guidelines range is 30,000 to 250,000.

17   Probation indicated that he has no ability to pay a fine.  The

18   Court agrees.  The defendant has been detained for almost

19   3 years and, thus, has not been able to earn a living.  He

20   otherwise lacks assets and will have to pay restitution.

21        The government suggests I impose a fine for the amount

22   identified in a GiveSendGo fund, but that money was originally

23   sent to defendant's girlfriend, and he has retained counsel.

24   So I can't make a determination that defendant is profiting

25   from that source.  Moreover, he has indicated that almost all

1    of that amount went to pay his court-ordered child support

2    throughout his incarceration.  So I don't intend to impose a

3    fine.

4         The Court is to impose a sentence sufficient but not

5    greater than necessary to comply with the purposes set forth in

6    paragraph 2 of the subsection.  I'm to impose a sentence that

7    reflects the seriousness of the offense, promotes respect for

8    the law, and provides just punishment for the offense, and

9    takes into consideration the nature and circumstances of the

10   offense and the history and characteristics of the defendant.

11        Of course, the offense is extremely serious.  A number

12   of my colleagues have spoken eloquently about this.  Defendant

13   took place in a mob riot that took place on the Capitol on

14   January 6th, 2021.  Many of the rioters, including defendant,

15   engaged in violence and some destroyed property.  I have

16   watched numerous videos of rioters who, like defendant, engaged

17   in hand-to-hand combat with police officials.

18        It was not a peaceful event.  More than 100 law

19   enforcement officers were injured on that day.  Moreover, the

20   Capitol sustained over $1.5 million in property damage.  Many

21   of the rioters, including defendant, intended to block the

22   certification of the votes for President Joe Biden.  Although

23   the rioters failed to block the certification, they delayed it

24   for several hours.

25        The security breach forced lawmakers to hide inside the

1    House gallery until they could be evacuated to undisclosed

2    locations.  In short, the rioters' actions threatened the

3    peaceful transfer of power, a direct attack on our nation's

4    democracy.

5         And the defendant fits comfortably within the group of

6    rioters that actually attacked law enforcement.  He was part of

7    some of the most violent clashes that day that took place at

8    the archway tunnel at the lower west terrace.  Defendant stood

9    in the crowd of rioters and watched the attacks on law

10   enforcement as it unfolded.

11        He moved towards the line of officers in the tunnel,

12   and after one co-defendant grabbed Officer A.W. and knocked

13   him to the ground, defendant grabbed Officer A.W.'s baton

14   and ripped it out of his hands with such force that he fell

15   backwards down the stairs.  Clearly, separating Officer A.W.

16   from his baton was not helping.  Without a baton to defend

17   himself, Officer A.W. was left defenseless.  Another

18   co-defendant grabbed Officer A.W.'s torso and lifted him, and

19   the two of them slid down the steps together with the

20   co-defendant on top of Officer A.W.

21        When they reached the bottom of the stairs, the

22   co-defendant's body pinned Officer A.W. down for approximately

23   25 seconds.  And while Officer A.W. tried to push the

24   co-defendant off of him, he was struck by rioters, and a rioter

25   pulled off his gas mask, after which he was hit with chemical

1   spray causing him extreme pain and difficulty breathing.

2          Finally, Officer A.W. was able to roll over and make his

3   way back to the police line.  A.W.'s injuries required that he

4   be off duty until May 2021 and only on limited duty until

5   approximately July 2021.

6          With respect to Officer B.M., another co-defendant

7   climbed over a railing and began striking Officer B.M. with a

8   crutch, then by the helmet and the neck of his ballistic vest,

9   pulled him down over Officer A.W. and assisted by the defendant

10  fully dragged him down the steps in a prone position into the

11  crowd of rioters where he was beaten by other co-defendants

12  with weapons, including a flagpole and a baton.  As a result of

13  this attack, Officer B.M. sustained physical injuries,

14  including bruising and abrasions.

15         But this intense battle in the tunnel is not the only

16  clashes that defendant had with police officers.  He started

17  the clashes about two and a half hours earlier that day.  As

18  defendant approached the Capitol Building around 2:00 p.m., he

19  saw that a battle was already going on and heard what he

20  believed were flash-bangs going off; yet he went towards the

21  battle.

22         He approached the line of officers who were positioned

23  west of the Capitol Building, many carrying riot shields.

24  Defendant and another rioter pushed from behind a third rioter

25  with a riot shield so that he ran into the police line.  As the

1   police officers attempted to repel them, defendant kept pushing

2   against the line until an officer pushed him back.

3        Defendant has characterized many of his actions as

4   trying to help.  Hard to imagine how any of this was helpful.

5   About half an hour later, defendant and another group of

6   rioters charged another police line and used two hands to push

7   against a riot shield held by an officer.  Again, not helpful.

8        A few minutes later, defendant and another riot engaged

9   in a tug-of-war with an officer over a helmet visor, but the

10  officer was able to retain it.  Again, hard to explain how this

11  could have been helpful.

12       Following the events of January 6th, defendant, fearing

13  arrest, set out to evade capture and make prosecution more

14  difficult.  He deleted text messages and other communications,

15  and also asked another individual to delete a January 6th

16  selfie video defendant had sent him.  Defendant also microwaved

17  laptops and hard drives and dropped his cell phone into a body

18  of water.

19       He also booked a flight to Zurich, Switzerland, in an

20  attempt to flee the United States.  Unable to board the flight,

21  defendant rented a car and drove towards Westchester, New York.

22  There the defendant attempted suicide by lacerating his wrists

23  and left leg with a razor blade, cut so deep they required

24  surgery to repair tendons and arteries, resulting in several

25  days of hospitalization.  It was there in Westchester, New

1    York, that defendant was arrested and taken into custody.

2         To his credit, defendant agreed to a stipulated trial,

3    thus, in part, accepting responsibility for his actions.

4    Although this came fairly late in the game.

5         But even his submissions to this Court as part of the

6    sentencing attempt to downplay -- even his submissions to this

7    Court as part of his sentencing attempt to downplay his violent

8    actions, instead characterizing many of his actions as an

9    attempt to help.  These characterizations are simply not

10   credible.

11        Defendant is a 54-year-old man with a college degree in

12   physics.  He has maintained steady, well-paying employment

13   throughout his adult life working in geophysics and weapons

14   disposal.

15        Defendant's upbringing is entirely unremarkable.  He

16   grew up in an intact family where all his material needs were

17   met, and there was no exposure to physical abuse, neglect, or

18   drug abuse.

19        Defendant is single but in a committed relationship and

20   claims to be engaged to be married upon release from prison.

21   His fiancée owns a home next door to defendant's elderly

22   parents.  Thus, defendant appears to have a stable residence to

23   return to upon release from prison in which to rehabilitate

24   himself.

25        He also indicates that he's likely to quickly obtain

1    employment upon release.

2         I'm going to take a five-minute break.  We'll start back

3    up in five minutes.

4              (Recess taken.)

5         THE COURT:  I apologize for that.  D.C. is certainly

6    beautiful in the springtime, but all this blooming is murder on

7    allergies.

8         So the Court is to impose a sentence that affords

9    adequate deterrence to criminal conduct, protects the public

10   from further crimes of the defendant.  The events of

11   January 6th involved a real, unprecedented confluence of events

12   spurred by then-President Trump and a number of his prominent

13   allies who bear much responsibility for what occurred on that

14   day.

15        Because defendant has been confined since his arrest, he

16   has not had an opportunity to demonstrate compliance while on

17   release status.  In the Court's view, an individual who has

18   directly and brazenly attacked law enforcement officers is

19   inherently dangerous to the public because one who does not

20   hesitate to attack a law enforcement officer would not hesitate

21   to attack any member of the population who angers him.

22        Moreover, the records suggest that defendant has

23   exhibited violence previously when upset in the home.  And due

24   to the defendant's history of violence against law enforcement,

25   the Court has some concern that Mr. Sabol could reoffend if he

1    is sufficiently angered and, thus, potentially posing an

2    ongoing risk to the public.

3            As he indicated, when interviewed by the FBI, he

4    thought -- stated that he was called to battle when it was

5    announced and he answered the call as a patriotic warrior.  It

6    doesn't take much imagination to imagine a similar call coming

7    out in the coming months, and the Court would be concerned that

8    Mr. Sabol would answer that call in the same way.

9            With respect to general deterrence, the Court believes

10   that further incarceration is necessary to deter other

11   potentially violent protesters from resolving their political

12   disputes through the use of violence rather than peaceful

13   demonstrations.

14           The Court is to provide the defendant with needed

15   educational or vocational training, medical care, or other

16   correctional treatment in the most effective manner.  Probation

17   has recommended mental health assessment and treatment as a

18   term of supervision, but defendant indicates that he does not

19   believe this would be beneficial.  The Court disagrees and will

20   order it.

21           Defendant has described his own behavior as a rage.  It

22   sounds like his previous issue with his son also involved a

23   certain amount of rage.  One of his rugby buddies made a

24   passing reference to the concussions endemic to this sport.

25   Following the issue with concussions in the NFL, a lot of the

1    symptoms involved rages.  It would be helpful to have a

2    professional explore these possibilities.

3         Additionally, I will impose a financial disclosure

4    requirement while the financial impositions -- meaning the

5    restitution -- are outstanding so that probation can make

6    certain that these amounts are paid off promptly given the

7    likelihood that defendant will return to gainful employment

8    quickly.

9         I do not intend to impose drug treatment while on

10   supervision because I do not view the defendant's reported

11   drug use, primarily involving marijuana usage in Colorado where

12   it is legal, other than -- other drugs, which occurred 25 years

13   earlier, as -- as being a major issue of concern for me.  As

14   recommended by probation, while in BOP custody, the Court will

15   recommend the Drug Abuse Education program and the Parenting

16   Program.

17        The Court is to consider the kinds of sentences

18   available.  Given the nature of the crime and the violence

19   directed at law enforcement involved, the Court is only

20   considering further incarceration.  The Court is to consider

21   the kinds of sentence and the sentencing range established for

22   the applicable category of offense committed by the applicable

23   category of defendant as set forth in the guidelines.

24        The Court has considered the applicable guidelines.  The

25   Court notes that certain enhancements, although clearly

1    applicable, such as the bodily injury conviction under 111(b),

2    perhaps overstate the seriousness of the offense.  For example,

3    B.M.'s injuries attributable to defendant, which were scrapes

4    and bruises, did not prevent him from returning to the line

5    quickly.  And the enhancements for 111(b) may overstate the

6    gravity of offense by partially double-counting when it is

7    added to other enhancements.

8         The Court is to consider any pertinent policy statements

9    that -- issued by the Sentencing Commission.  None have been

10   brought to my attention.

11        The Court is to impose a sentence that avoids

12   unwarranted sentence disparities among the defendants with

13   similar records who have been found guilty of similar conduct.

14   The government has provided a chart that lists a number of

15   January 6th sentencings.  I have previously closely analyzed

16   the other January 6th defendants who were convicted under

17   U.S.C. § 111 by researching the dockets of those cases,

18   including the applicable guidelines ranges.

19        The Court makes the observation that no matter how one

20   analyzes the 111 cases, either all of them, just those that

21   involve 111(a) and (b), some subset that eliminates high or low

22   outliers, or just those cases with guidelines similar to

23   defendant, the result is that the average sentence clusters

24   around the low end of the guidelines.

25        The Court recognizes that the government recommended a

1    midrange guideline sentence based on its own higher guidelines

2    calculations.  Obviously, the clearest comparators are the

3    co-defendants that I have already sentenced:  Barnhart, Stager,

4    Courson, Jersey, and Mullins.

5         I've also sentenced McAbee, but he went to trial and

6    didn't receive the acceptance of responsibility so he's

7    somewhat of an outlier.

8         Jersey received a low end of his guidelines range, as

9    did Mullins, minus a couple months due to pretrial restrictions

10   on his liberty, for which I gave him credit.

11        Barnhart also received a few months below the low end of

12   his guideline range because he had a significant period of

13   restricted liberties pretrial, for which I gave him some

14   credit, and the GPS ankle bracelet he wore during that period

15   credibly resulted in long-term damage to his leg.

16        Courson received a downward variance but was in Criminal

17   History Category II, making him different.

18        Stager received a downward variance but had suffered a

19   terrible childhood, as did Whitton, when he gets sentenced.

20        And, of course, McAbee went to a full trial, thus did

21   not receive credit for acceptance of responsibility.

22        So none of them were perfect comparators.

23        Several aspects of defendant's case set him apart from

24   his co-defendants.  One defendant engaged in multiple attacks,

25   not just those at the tunnel, over the course of hours.  None

1    of the other co-defendants had an extensive -- as an extensive

2    period of violence on that day.  Only two defendants came

3    prepared for battle that day bringing helmets, zip ties, a

4    radio, et cetera.  Only McAbee engaged in this type of

5    preparation, and he received the highest sentence of the group.

6         And third, defendant engaged in the most systematic

7    effort to obstruct justice of any of the defendants.

8         So this suggests that I should impose a sentence

9    somewhere higher than Jersey, Stager, and Courson, but lower

10    than McAbee.

11         The Court is to impose a sentence that provides

12    restitution to the victims of the offense.  I've indicated

13    already that I will impose the restitution of $2,000 for -- to

14    reimburse the Architect of the Capitol, and $30,165.65 to

15    reimburse MPD; that amount being joint and several with Jersey,

16    Mullins, and McAbee.

17         I will now indicate the sentence to be imposed, but

18    counsel will have one more opportunity to make any legal

19    objections before the sentence is actually imposed.

20         Mr. Cirocco, do you have any objections to any of the

21    factors I've considered?

22              MR. CIROCCO:  No objections, Your Honor.

23              THE COURT:  From the government?

24              MS. KEARNEY:  No objection.

25              THE COURT:  Okay.  Mr. Sabol, if you can come to the

1    podium.

2         It is the judgment of the Court that you, Jeffrey Sabol,

3    are hereby committed to the custody of the Bureau of Prisons

4    for a term of 63 months on Counts 1, 8, and 10 to run

5    concurrently.  You are further sentenced to serve a 36-month

6    term of supervised release as to Counts 1, 8, and 10 to run

7    concurrently.

8         You are further ordered to pay a special assessment as

9    required by statute of $300.  That's a hundred dollars for each

10   felony conviction.  The Court finds that you have no ability to

11   pay a fine and, therefore, does not impose one.  You are

12   ordered to make restitution through the clerk's office to the

13   Architect of the Capitol in the amount of $2,000 and to MPD in

14   the amount of $30,165.65.  The financial obligation shall be

15   paid at a rate of no less than $250 per month beginning 30 days

16   after your release from incarceration.

17        The special assessment and restitution are payable to

18   the Clerk of the Court for the U.S. District Court of the

19   District of Columbia.

20        Within 30 days of any change of address, you shall

21   notify the Clerk of the Court of the change until such time as

22   the financial obligations are paid in full.

23        While on supervision, you shall submit to collection of

24   DNA.  You shall not possess a firearm or other dangerous

25   weapon.  You shall not use or possess an illegal controlled

1   substance, and submit to one drug test within 15 days of

2   placement on supervision and at least 2 periodic drug tests

3   thereafter.  And you shall not commit another federal, state,

4   or local crime.

5          You shall also abide by the general conditions of

6   supervision adopted by the U.S. Probation Office, as well as

7   the following special conditions:

8          As I indicated, you'll, as part of supervision, be

9   required to participate in mental health assessment and

10  treatment to the extent required.  Such assessment and

11  treatment will be monitored and supervised by the probation

12  office.

13         There's a financial information disclosure requirement

14  so that they can track your ability to pay the restitution.

15  And that will also include a financial restriction about your

16  ability to open new lines of credit and that sort of thing

17  without approval.

18         Counsel, any reasons other than those previously stated

19  and argued why the sentence should not be imposed as just

20  stated?

21              MR. CIROCCO:  No, Your Honor.

22              THE COURT:  Okay.  I'll impose it as stated.  And I

23  will make the recommendation to Fort Dix.

24              MR. CIROCCO:  Thank you.

25              THE COURT:  I gather that there's charges that need

1   to be dismissed.  According to my count, he was convicted of

2   Counts 1, 8, and 10 of the third superseding indictment, and we

3   need to dismiss Counts 2, 3, 4, 5, 6, 9, 14, 18, 19, 20, and

4   24.

5            MS. KEARNEY:  I think that's correct.  Give me one

6   moment.

7            THE COURT:  All right.

8            MS. KEARNEY:  2, 3, 4, 5, 6, 9 -- sorry.  2, 3, 4, 5,

9   6, 9, 14, 18, 19, and 20.

10            THE COURT:  Not 24?

11            MS. KEARNEY:  Yes, 24.

12            THE COURT:  Okay.  All right.  I think -- I think

13   we're on the same page.

14            MS. KEARNEY:  The government moves to dismiss those

15   counts.

16            THE COURT:  I will dismiss them.

17       All right.  And the government will object to transfer

18   of jurisdiction to the Northern District of New York for the

19   supervision?

20            MS. KEARNEY:  We do, Your Honor, and just given kind

21   of the uncertainty of where Mr. Sabol will live -- I agree with

22   the Court, it's likely he will live with his fiancée -- we

23   think the best course of action would be to schedule a check-in

24   prior to the transfer of the jurisdiction.

25            THE COURT:  All right.  I'm going to transfer the

1    supervision and jurisdiction to the Northern District of

2    New York.  And if things change, probation will tell me.

3           All right.  Mr. Sabol, you were convicted by a

4    stipulated trial; so there was no guilty plea.  So your

5    appellate rights are fully preserved.  You have the right -- to

6    the extent you decide to appeal, you have the right to apply

7    for leave to appeal in forma pauperis.  That means without the

8    payment of costs.  And if you so request and qualify, the Clerk

9    of the Court will prepare and file a notice of appeal on your

10   behalf; although I note that you're represented by very able

11   counsel who can assist you in that process.

12          With few exceptions, any notice of appeal must be filed

13   within 14 days of the entry of judgment.  This has been a very

14   busy week.  We have -- I've had -- will have by the end of the

15   week five sentences this week.  So it may take a few days to

16   get that judgment and commitment on the docket.  But once that

17   happens, sometime probably early next week, you have 14 days

18   from that point to file any notice of appeal.

19          Any other issues that we need to address today?

20          MR. CIROCCO:  None from the defense, Judge.

21          Judge, just for the record, my client just wants to make

22   sure his time that he's been in counts towards his sentence,

23   which I told him --

24          THE COURT:  Of course.  Yeah.  I'll -- for the

25   record, I'll put that in -- yeah.  Defendant has been in

1    continuous custody since January 22nd, 2021, nearly 38 months,

2    and he will receive credit for all of that.  I don't have to

3    say that.  BOP does that automatically, but I typically say it.

4    So thank you for reminding me.

5         All right.  Anything else from the government?

6         MS. KEARNEY:  Yes, Your Honor.  Just for

7    housekeeping, this is a third superseding indictment.  So the

8    government also moves to dismiss the first, second, and zero

9    superseding indictment.

10        THE COURT:  Okay.  I will do that.

11        All right.  Mr. Sabol, a lot of what happened on that

12   day and your actions -- and in particular your attempt to flee

13   and destroy evidence and the like -- doesn't necessarily

14   reflect that you were thinking particularly clearly.  And you

15   might want to examine that.  You know, your buddies kind of

16   joked about concussions, but that's real and -- I don't know.

17   You know, some of those things can't be checked while a person

18   is still alive, but there must be some -- some way to examine

19   whether all those collisions have had an impact on how clear

20   you're able to think.  It can't hurt to know.

21        Good luck to you.  Sounds like you have a pretty good

22   plan on where to go once you get out --

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  -- and people are waiting for you, which

25   is not the case for everyone.  So you're lucky in that respect.

1    And I hope for the best.

2              THE DEFENDANT:  Thank you, sir.

3              THE COURT:  All right.

4              (Proceedings were concluded at 11:14 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3       I, Nancy J. Meyer, Registered Diplomate Reporter,

4 Certified Realtime Reporter, do hereby certify that the above

5 and foregoing constitutes a true and accurate transcript of my

6 stenograph notes and is a full, true, and complete transcript

7 of the proceedings to the best of my ability.

8

9       Dated this 27th day of March, 2024.

10

11       /s/ Nancy J. Meyer
      Nancy J. Meyer
12       Official Court Reporter
      Registered Diplomate Reporter
13       Certified Realtime Reporter
      333 Constitution Avenue Northwest
14       Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25